DISCOUNT CO., INC.

v.

The UNITED STATES.

No. 178–75.

United States Court of Claims.

April 20, 1977.

As Amended on Denial of Rehearing May 27, 1977.

Ralf H. Erlandson, Milwaukie, Or., attorney of record, for plaintiff.

Robert M. Hollis, Washington, D.C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D.C., for defendant.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

This contract case is before us under the Wunderlich Act, 41 U.S.C. §§ 321–22 (1970), for scrutiny of a decision by the Department of Agriculture Board of Contract Appeals (Board). Plaintiff, Discount Company, Inc., appealed its termination for default to the Board, requesting that the termination be considered for the convenience of the Government.[1] The Board decided that the default termination was appropriate and Discount subsequently requested a rehearing, which was denied with an opinion. Plaintiff then brought suit here to review the Board's decision, and Trial Judge Browne has recommended that the administrative determination in favor of the Government be reversed. We conclude, however, that the Board's upholding of the default termination should stand.

In May, 1968, the Forest Service awarded plaintiff a contract to construct the Mona Campground and Lookout Boating Site in the Willamette National Forest, Oregon. For a contract price of $104,399.99, Discount was to complete a boat launching ramp, parking lot and campgrounds within 180 days of the notice to proceed, which was issued on June 24, 1968.

---

1. A termination for convenience is generally more favorable to a contractor than one for default. Under a termination for convenience, a contractor may receive his costs and any profit to date. If terminated for default, the contractor loses compensation for unpaid work-in-progress, and may be liable for delay or liquidated damages and excess costs of reprocurement. *See, e. g., G. L. Christian and Assoc. v. United States,* 312 F.2d 418, 160 Ct.Cl. 1, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); R. Nash & J. Cibinic, Federal Procurement Law, pp. 651–90, 755–778, 2d ed. (1969).

From the beginning, plaintiff encountered difficulties on the job.[2] Discount was nonetheless on schedule at the time work was suspended (due to adverse weather conditions) in December, 1968. In October, 1968, the contracting officer had decided that plaintiff's work on the parking area and boat ramp was not in accordance with specifications and directed the contractor to remove the structures during the next construction season.[3] In addition, the contracting officer reminded plaintiff that during the next construction season the boat ramp area would be partially covered by the rising water level in the Lake Mona Reservoir. In fact, the water level limited Discount's access to the boat ramp and parking lot for most of the 1969 building season.

Prior to the resumption of work for the 1969 season, Discount and the Government's representatives had two conferences to decide on the best way to proceed with the removal of the nonconforming structures and to plan the remaining work under the contract. The contractor agreed to wait until September 1969 (when the boat ramp would no longer be under water) to work on the allegedly nonconforming structures but to begin its campground construction on June 2, 1969.[4]

On June 2, the contracting officer submitted to Discount a change order which designated an alternative borrow site and also gave plaintiff a partial work resumption order for the campground construction agreed to at the second pre-season conference. Plaintiff returned the order unsigned and alleged that it could not proceed because of problems with the Government's restaking of the area and certain clearing and grubbing difficulties. When the restaking was completed, the work order was reissued and signed on June 24, 1969, effective the next day. No work, however, was begun on the campground.

On July 14, 1969, the Forest Service ordered a full resumption of work, effective July 15. This full work resumption order took into account the Government's anticipated "as is" acceptance of the boat ramp (see footnote 3, supra) and required work to resume on all other phases of the project (particularly the campground). Despite this order (and the previous partial resumption order of June 24), which required work on the campground area (unaffected by the high water level), the Government alleges that no substantial amount of work was performed on the job site during the summer of 1969. Because of this alleged lack of progress, the Government, on July 23, 1969, sent Discount a 10-day cure notice demanding that work be resumed so as to ensure the project's completion before the expiration of the total contractual time remaining. It also requested a schedule for the work not yet begun or completed. When Discount neither resumed work nor provided a schedule, the contract was terminated for default on August 12th.

It should be inserted here that an additional point of contention between the parties arose during the summer of 1969. In June of that year, the Government submitted to plaintiff Pay Invoice No. 6, representing an estimated progress payment for

**2.** One such problem, a continuing source of friction between the parties, was plaintiff's contention that a designated borrow pit site held so much unsuitable material that it represented a changed condition. See Plaintiff's Exhibit 5, Letter of July 31, 1968. The contracting officer denied plaintiff's changed condition claim and plaintiff appealed to the Board but the issue was not resolved during the 1969 construction season involved here.

**3.** The Government claimed that the ramp and lot were nonconforming because the contractor used unsuitable materials and methods in their construction. During the period October, 1968 through July 18, 1969, the parties negotiated an "as is" acceptance of the structures. On July 18, 1969, Change Order No. 5 was issued and the "as is" acceptance confirmed. The record indicates that Discount was fully aware of the ongoing negotiations and was fairly certain of the outcome by the first week of July, 1969.

**4.** While access to the Lookout Boat site was precluded by the rising water level, conditions at the campground permitted work to resume at any time during the 1969 season.

work done in the previous year. Plaintiff disputed the estimated percentage of work completed and refused to sign; when the parties finally agreed, on August 4, 1969, to the amount due, the Government decided that Discount was in default of the 10-day cure notice, and was likely to be terminated; payment was therefore withheld to protect the sureties. This dispute over Pay Invoice No. 6 has resurfaced as an important point in the Trial Judge's decision and in the Government's objections to it.

■ Unlike the Trial Judge, we consider that the Board's factual findings were neither arbitrary, capricious, so erroneous as to imply bad faith, or unsupported by substantial evidence in the record as a whole—and that the Board's ultimate determination was permissible. The fundamental issue before the administrative tribunal, and now before the court, is whether Discount made so little progress on its contract in the summer of 1969 that a default termination was justified. The Government's notice of termination stated that at the time it defaulted Discount the extent of plaintiff's work was inadequate indication of the diligent performance required to assure completion of the project within the contractual time. The Board found that plaintiff failed to perform sufficient work during the summer of 1969 and that its failure was unexcused, and then concluded that based on Discount's entire performance the termination was warranted. We hold these determinations to be adequately supported under the Wunderlich Act.

First, the record demonstrates that the Board could allowably find that, despite two resumption-of-work orders and plaintiff's assurances that work would soon resume, no substantial progress was actually made on campground construction during the 1969 work season. As of August 4, 1969—weeks after the order to resume work had issued and a day after the 10-day cure notice had expired—plaintiff had neither begun more-than-piddling construction activities at the campground, nor assured the Government that it could meet the completion deadline. Nor was any substantial work thereafter undertaken. The significant job left to do was the preparation and completion of the campground, and there was sufficient affirmative proof that Discount did practically nothing toward that goal.[5] Plaintiff impliedly admits as much when it repeatedly says in its brief that it could not grade the campground without borrow, but that it had no proper place

---

5. For instance a contemporaneous memorandum (by the contracting officer's administrative representative) of a meeting of July 31st stated: "In regard to clearing and grading, Mr. Norelius [plaintiff's chief officer] said, 'He will take the necessary steps for preparations, starting on Monday, to resume work.' * * * I emphasized Mr. Norelius that all phases of work with the exception of the boat ramp were available and suitable for a resumption of work and the Government's position was that there was no reason why work could not be resumed in full. Mr. Norelius stated that he is preparing for a full resumption of work on all phases within the next two weeks and that his continuation of work on this contract will depend on talks he is to have with his bonding company on August 1."

Another contemporaneous memorandum by the same Government official describes a second conference at the site on August 4th, a day after the expiration of the 10-day cure notice:

"We then discussed the planned resumption of work in relation to remaining contract time. Mr. Norelius was completely noncommittal as to any definite plans other than the testing of that section of the waterline already installed. I attempted over a period of approximately one hour to get a firm commitment from Mr. Norelius as to planned equipment and manpower and his schedule of completion of the project. He stated continually that he would commence to make the necessary preparations to resume work. It was apparent that he had no firm commitments at this time. I advised Mr. Norelius again that the 10 day cure period had expired and that we would have to make a decision regarding default of this contract. To be fair to him I would delay this decision one additional day provided he furnish us with a detailed schedule as to the proposed completion of the contract within the remaining time (approximately 46 calendar days remain). * * *"

from which to obtain borrow (a cardinal point we discuss later). Discount did do some minor work on other aspects (e. g. on a waterline and some plumbing) but there is very little doubt that it performed little or nothing on the central component—the clearing and grading of the campground.[6]

The next question is: did the contractor have adequate justification for this failure to make progress on the campground work? Before the Board and the court, plaintiff has contended that progress was impeded because of the unsuitability (allegedly amounting to a changed condition) of the material at the originally designated borrow site. The borrow site problem was disputed throughout 1968 (see footnote 2, supra), and in June 1969 a change order was issued designating an alternative site for the contractor's use. It is worth noting, however, that the material at the initial site was not so unsuitable as to make performance impossible and the contractor therefore had a duty to continue performance during the processing of its claim. See, e. g., Penker Constr. Co. v. United States, 96 Ct.Cl. 1, 37 (1942). In fact, that part of plaintiff's work which required material from the first site (i. e., the boat ramp) was accepted "as is" by the Government. See footnote 3, supra. The first borrow site seems to have been no longer wholly available in the summer of 1969 (because partially covered by water), but the remaining borrow material needed for the 1969 campground construction could readily have been taken from the alternate site designated early that June.[7] The plaintiff's only answer is that it rejected this proposed change order and was never officially ordered to use the alternate site. Discount's objection was not that the new borrow was unusable—on the contrary, it is

quite clear that it was adequate—but that the change order should include an upward equitable adjustment because of higher transportation costs.[8] This is precisely the kind of controversy to be handled under the "disputes" mechanism by appeal to the Board if necessary. Meanwhile plaintiff was required by its contract to continue performance under the change order. See Penker Constr. Co. v. United States, supra. But, Discount now says, the change order was merely a proposal, the defendant never took the further step of unilaterally ordering it to use the alternate location despite its objections, and without such a further unilateral order the contractor would have waived its right to the equitable adjustment it desired. This hypertechnical contention—wholly divorced from the realities of the situation—can hardly be accepted as a proper excuse for refusing to make use of the alternate borrow site. In the circumstances here, it is immaterial whether the designation of the new borrow place was merely a government proposal or a fully operative and effective change order. Plaintiff knew that the designation of the alternate borrow site came to it in June 1969 on a form labeled "Contract Change Order Or Data Sheet Covering Amendments" as "Change Order Number 3"; it also knew that the new site was available, that the Government was willing to have it used and wanted it used if it became the only suitable borrow open to the contractor. Moreover, plaintiff was aware, or should have known, that it could have protected its right to an equitable adjustment by simply saying so—that it would comply with Change Order Number 3 but would still pursue its alleged right to an increase in the contract price. Plaintiff never asked for the additional unilateral order it now calls

6. Discount complains about the stop order of July 2d prohibiting it from going ahead with the correction of the alleged deficiencies in the boat ramp, but, as we have indicated (footnote 3, supra), that order was issued because the Government was about to accept the boat ramp "as is"— and plaintiff knew that this was so. Furthermore, this stop order had very little to do with the work on the campground which

was still open to plaintiff. These were different aspects of the contract work.

7. The Government also offered to select still another borrow site.

8. The change order, as transmitted by the Government, provided for no increase in the contract price.

an absolute prerequisite, nor did it tell the defendant, when it was being repeatedly pressed in the summer of 1969 to proceed with the work, that the main obstacle was that it could not safely use the alternate borrow site without such an additional order. We must infer that this excuse, the major one proffered us, is an afterthought, not a real justification for failing to proceed with the campground work in the 1969 summer.

■ Discount also has insisted that construction during the 1969 season was impeded due to an alleged failure by the Government to properly restake the area. There is however, enough evidence (though not undisputed) showing that the Government agreed (at the pre-work conferences) to restake the area and that this work was sufficiently completed in mid-June. The Mona Campground construction, scheduled for the 1969 season, could have gone forward by the end of that month. Accordingly, the Board's finding that the staking difficulties did not preclude Discount's resumption of work throughout the entire season is supported by substantial evidence.

■ There are other assertions made on plaintiff's behalf to demonstrate that the default termination was improper. One is that the termination, which was in effect one for anticipated failure to complete, was wrongful because the contractual time had not yet run. The Trial Judge distinguished the instant case from those in which the contractor was already at the end of the contract's time period when the termination notice issued. Of course, the distinction is factually correct but the default clause in this contract did not require a finding that completion within the contract's time limitations was impossible. Rather, under this contract default termination was appropriate if a demonstrated lack of diligence indicated that the Government could not be

assured of timely completion. It is therefore proper, once this lack of diligence has been found, to rely upon cases involving abandoned or repudiated contracts, as well as other decisions similar to the one at bar which have upheld "failure to make progress" terminations. *See, e. g., Universal Fiberglass Corp. v. United States,* 537 F.2d 393, 210 Ct.Cl. —— (1976); *American Dredging Co.,* ENGBCA 2920, 72–1 BCA ¶ 9316, *aff'd,* 207 Ct.Cl. 1010 (1975).[9]

■ The Trial Judge also found that, because the contractual time had not yet expired, Discount was in fact wrongfully terminated on a technicality—its failure to provide a work schedule at the last hour (requested by the contracting officer but not explicitly required under the contract) outlining proposed plans for further work progress. The record is plain, however, that the default termination was not based on this demand *per se* but rather on the over-all evidence of Discount's failure to prosecute diligently its work under the contract. The function of the work schedule was to show that the contractor was ready, willing and able to make progress; Discount's failure to furnish such a schedule merely served to bolster the Government's position that it was justifiably insecure about the contract's timely completion.

■ Another contention on plaintiff's behalf is the effect of the much-disputed Pay Invoice No. 6. Discount did not directly contend, either in its brief or on oral argument before us, that the Government's failure to pay the full amount requested by plaintiff precluded it from proceeding during the 1969 construction season. Further, the Board determined that there was no evidence before it sufficient to prove that the failure to proceed under the contract was connected with Discount's non-receipt of government payments. The Trial Judge, however, emphasized Discount's financial

**9.** Because their facts were so different from those we must accept here, neither *Dale Constr. Co. v. United States,* 168 Ct.Cl. 692 (1964), nor *Schlesinger v. United States,* 390 F.2d 702, 182 Ct.Cl. 571 (1968), is pertinent. In the first, the only permissible finding was that a ready, will-

ing, and able contractor was terminated, not for lack of diligence, but because it had submitted a claim for extras. In the latter, the Navy failed to use its own discretion whether or not to terminate but simply buckled under pressure from Congress.

difficulties and found that the Government's refusal to pay under Invoice No. 6 so severely hampered plaintiff's performance that its lack of progress was excusable. We do not think that this conclusion can stand against the Board's contrary finding. If the plaintiff had been in dire financial straits it could have have accepted the amount offered under the invoice and disputed the remainder. In addition, this court has held that financial difficulties create excusable delays only if precipitated by Government actions.[10] The non-payment here was not as a result of the Government's wrongful withholding of money clearly due but rather resulted from a good faith controversy, which was handled through appropriate channels, over the amount owed. It is true that the amount was finally settled on August 4, 1969, but defendant still refused to pay because the 10-day cure period had expired and the Forest Service personnel felt that the contract was likely to be terminated for default. We do not decide whether or not the Government was right in retaining the check at that late point for the benefit of the surety[11] because it seems clear that the failure to pay after August 4th did not trigger plaintiff's default which, as the Board found, had already existed and continued for some time.[12]

■ There is one final point to be mentioned. The Trial Judge has raised the issue of Government prejudice against plaintiff and has suggested that this prejudice tainted the default termination. Although it is obvious that theirs was not a friction-free relationship, the contractor did not argue prejudice before the Board or the Trial Division of this court. The Trial Judge does not point to any evidence in the record (except perhaps Discount's own accusations of prejudice in very late self-serving letters to the contracting officer) sufficient to meet the high burden of demonstrating the Government's bad faith.[13] On the contrary, this assertion of prejudice seems to us unfounded in the record. The Government officials appear to have acted in the full and honest belief that plaintiff had no proper excuse for failing to go forward with the work, and at the very least they had much support in plaintiff's attitude and actions. As for the Board, though it decided this case against Discount (as we have held, allowably so), it determined another appeal, very shortly before, in its favor.[14]

■ In sum, we accept the Board's findings and conclusion, as our review of the case reveals that the Board's determination was supported by substantial evidence on the record and is in harmony with relevant contract law. The Board's decision is therefore affirmed. Defendant's motion for summary judgment is granted, plaintiff's motion is denied, and the petition is dismissed.

KUNZIG, Judge, dissenting:

I respectfully dissent from the majority opinion. I would adopt the opinion of Trial Judge Browne, which follows hereafter:

BROWNE, Trial Judge: This case comes before the court for judicial review, under the provisions of the Wunderlich Act,[1] of a decision of the Board of Contract Appeals for the United States Department of Agri-

10. See, e. g., Litchfield Mfg. Corp. v. United States, 338 F.2d 94, 167 Ct.Cl. 604 (1964).

11. The surety had not requested that the payment be withheld but there had apparently been some claims by suppliers (and others) of unpaid bills.

12. After August 4, plaintiff does not appear to have inquired about payment of Invoice No. 6 until the afternoon of August 11. The termination was the very next day, August 12.

13. See, e. g., Knotts v. United States, 121 F.Supp. 630, 631, 128 Ct.Cl. 489, 492 (1954), that the presumption of official good faith can be overcome only by "well nigh irrefragable proof."

14. The plaintiff itself rejected (before the Board) the position that it was financially hampered on the instant contract by its problems on the other one.

1. 68 Stat. 81, 41 U.S.C. §§ 321 and 322 (1970).

culture (Board) dated June 25, 1974[2] and the denial of appellant's motion for reconsideration by the Board on September 26, 1974.[3]

Plaintiff, Discount Co., Inc. of Springfield, Oregon, was awarded Contract No. 002112 on May 20, 1968, by the Forest Service of the United States Department of Agriculture. The contract called for construction of a facility identified as "Mona Campground and Lookout Boating Site" in the Willamette National Forest, Lane County, Oregon. The amount of the contract was $104,399.99. Work was to be completed within 180 calendar days after receipt of notice to proceed. The contract was terminated by the Government by "Notice of Termination" dated August 12, 1969. The termination was based on anticipated default of the contractor, the time for completion not having expired as of the date of termination.

Plaintiff seeks, in this case, to have the default termination be denominated as a termination for the convenience of the Government and that a determination be made as to the amount of equitable adjustment to which plaintiff would be entitled or, in the alternative, to recover in *quantum meruit* for plaintiff's services and to recover plaintiff's damages proximately caused by the Government's termination of the contract.

Plaintiff asserts that the decisions of the Board were:

1. Arbitrary and capricious;
2. So grossly erroneous as to imply bad faith;
3. Not supported by substantial evidence.

Plaintiff further asserts that the decisions of the Board were erroneous as a matter of law.

Defendant supports the Board's decision both as to the facts and the law.

I would find that termination was for the convenience of the Government and remand the case for determination of the amount to which plaintiff is entitled as equitable adjustment and damages.[4]

### I. Summary of Facts

The Forest Service of the United States Department of Agriculture awarded Contract No. 002112 on May 20, 1968 to Discount Co., Inc., P. O. Box 17272, Portland, Oregon 97217 for "Construction of Mona Campground and Lookout Boating Site" in Willamette National Forest, Lane County, Oregon. The contract called for completion of the work within 180 calendar days after receipt of notice to proceed. Work was to commence within 10 calendar days after date of receipt of notice to proceed.

The contract called for, among other things, construction of a number of campground camp units, a boat-launching ramp and a parking area. The contract specified the location of a "Case I borrow source" from which the contractor could obtain fill to be used as a base for the boating ramp and the parking area. The composition of the material of the Case I borrow source was the principal object of controversy throughout the period of the contract. The controversy over this matter was the proximate cause of the delay in performance by the contractor.

Shortly after the contractor commenced work, he found that the Case I borrow source contained a large amount of unsuitable material. The contracting officer ordered the unsuitable material to be removed and issued a work order to authorize the extra work. However, no provision was made in the work order dated June 28, 1968 for extra payment for removing the unsuitable material from the borrow source. By letter dated July 31, 1968, the contractor requested an increase of 87 cents per cubic yard to cover the increased cost of complying with the work order issued by the contracting officer.

In the same letter, the contractor requested, as an alternative, that another bor-

---

**2.** AGBCA No. 273, 74–2 BCA ¶ 10,775.

**3.** AGBCA No. 273, 74–2 BCA ¶ 10,855.

**4.** 28 U.S.C. § 1491 (Supp. IV, 1974).

row source, containing the necessary amount of approved acceptable material, be provided and that equitable adjustment in payment and contract time be made.

Concurrently with the controversy over the suitability of the Case I borrow source material, a disagreement arose over a work order issued by the contracting officer dated June 28, 1968 requiring 32 fires to burn trees, down timber, stumps, brush, wood chunks and sticks removed from the Case I borrow. By letter dated October 3, 1968, the contractor requested payment for the additional work required to comply with this work order. By letter dated September 16, 1968, the Contracting Officer's Authorized Representative (COAR) advised the contractor that his claims for additional compensation for this work would not be approved.

When the contractor complained about the decision of the COAR, an investigation was made by the Contracting Officer's Representative (COR), Mr. Hickey, and Inspector Campbell. A report on the results of that inspection dated November 1, 1968 indicated that even though most of the unsuitable material from the borrow pit was piled in one corner of the borrow pit there were 20 small piles of debris around the parking lot and boat ramp.[5]

It appeared to the inspecting team that the debris in the 20 piles resulted from a clearing of the boat ramp and parking lot areas and included a small amount of debris not required to be removed under the work order of which the contractor was complaining. The report also indicated that the inspecting team did not see any burning of any of the debris from the borrow material. In fact, their check of the record of the ranger district showed that the last burning permit issued to the contractor was for the period of July 16 to July 19 whereas the excavation of the borrow material did not start until July 24, 1968.

Work was suspended during the winter months of 1968–1969, during which time the progress made by the contractor was reviewed. A letter dated January 2, 1969 was sent to the contractor advising him of the results of the review to that date. Among other things, it was stated that:

* * * there are one or two points that we feel should be brought to your attention as they will undoubtedly reflect on the scheduling of your work following the resumption of operations.

The report also stated that as of the suspension of work on December 18, 1968, 102 days of the 180-day contract period had been used (constituting 57 percent of the time allowed) and that 27 percent of the contract work had been completed. However, the report stated:

According to your proposed progress schedule submitted on August 20, 1968, you are presently on schedule from an overall standpoint although some individual items are either behind or ahead of the schedule.

The report also indicated that, due to the schedule of the Corps of Engineers in filling the reservoir to which the boat ramp would lead, the lower end of the boat ramp would be under water around May 1, 1969. The report stated:

This situation may present a problem in completing the contract on schedule and we ask that you give it your fullest attention.

The only item specifically mentioned as requiring early attention was a pile of debris, then located within the limits of the reservoir, since the water level would rise to that point "sometime late in March or early April."

No provision was made at that time for resumption of work before the level of water in the reservoir would reach the lower end of the boat ramp.

Finally, the report made the following request:

* * * In order that we may program our workload and inspector needs, it would be appreciated if you would con-

---

5. These were 20 of the 32 sources of fires required by the work order.

tact COR Hickey at your earliest opportunity and advise him of your detailed schedule for completion of the boat ramp and parking lot and also the completion of the clearing operations in the campground.

Thus it appeared that there was a truce in the "running battle" between the COR, COAR, and the contractor, which placed the contractor and the Government representatives on a new and amicable footing when the work would resume in the spring.

A "prework resumption meeting" was held at the site on May 14, 1969 "to review past work and discuss future plans with the contractor and his superintendent." Eight Government representatives attended the meetings along with the contractor and the contractor's superintendent.

Whereas it was anticipated that the water level of the reservoir at the boat ramp would reach a high elevation of 1,350 feet by about May 1, the water level reached an elevation of approximately 1,348 feet [5a] as of May 14, 1969 (thereby covering a major portion of the boat ramp).

The Government, upon completion of this inspection, contended that the placement of the borrow material in the boat ramp and parking lot was not in accordance with the specifications since it contained more than the allowable amount of unsuitable borrow and that the two areas, therefore, would not be acceptable in their state at that time. The minutes of the meeting as recorded by the COAR, with reference to the high water level, included the following statement:

　\* \* \* Under these conditions the Government recognizes the impracticality of resuming work on this portion of the contract on a piecemeal basis. Therefore it will be the contractor's option to resume work on that area available to him

or delay all work on the Lookout Boat Site until the water level recedes, which is anticipated to be in the later part of September.[6]

The minutes further indicate:

　Mr. Angell [the contractor's superintendent] indicated that it was not planned to resume work on the boat ramp and parking lot until such a time that the water level was down and removal and replacement of fills could be a complete and continuous operation.

The position of the Government with regard to the suitability of the Case I borrow source remained unchanged as of the time of the meeting. The minutes indicate, however, that a second source previously not available to the Forest Service for its use, would be designated as an Alternate Case I source and could be used by the contractor. The minutes further state:

　\* \* \* The alternate source was pointed out and examined. The limits of the source will be staked on the ground and a change order issued prior to resumption of work. The contractor may use either or both sources.[7]

The campground area was inspected and the minutes indicate that the ground conditions in that area were favorable and would permit work to resume at any time. However, clearing and construction stakes which were previously placed "to a great extent, were missing or destroyed." It was agreed that the Forest Service would replace the staking at no expense to the contractor, prior to the resumption of work. The restaking was to commence on May 20 with arrangements being made for the contractor's superintendent to meet with the COR at the site the following day, to view the staking operations and become familiar with the coding and placement of the stakes.

---

**5a.** The elevation was apparently stated erroneously as 1,648 feet in plaintiff's exhibit 8 and in the transcript at page 60.

**6.** The Government contends that all other work, except the "work on the Lookout Boat Site" was to proceed on full schedule in the meantime. The contractor understood that no work was re-

quired until all work could be done on a continuous basis.

**7.** In the context of the minutes of the meeting, the alternate source would not be used until September, when work on the boat ramp would be resumed.

Upon completion of the staking, a controversy arose over lack of completion of the restaking by the Forest Service, making the resumption of work on May 26, 1969 impossible. (The minutes indicate that 78 days of the 180 days still remained for the work to be completed under the contract as of that time.)

Although one pile of slash and debris (located northeast of camp unit No. 21) was partly covered by water from the reservoir and could not be burned until the water level receded (in September), the remainder of the clearing and grubbing could have continued without delay. In conclusion, it was mutually agreed that work would resume on May 26, 1969 on the campground, following completion of the restaking. The agreement to resume work, however, is somewhat inconsistent with the fact that it was impractical for the contractor to resume work on the boating site portion of the contract on a piecemeal basis, it being the contractor's option

* * * to resume work on that area available to him or delay all work on the Lookout Boat Site until the water level recedes, which is anticipated to be in the later part of September.

A further meeting was scheduled for May 23, 1969 in the Forest Service office in Eugene, Oregon.

The further meeting took place as scheduled. The COR, the COAR, and the previous COR, as well as the contractor's superintendent, were present. At that meeting it was understood that the construction staking could not be completed until May 29, 1969 but that the clearing limit staking was nearly completed and would be completed by May 26, as scheduled.

It was mutually agreed that the resumption of work *on the campground* should be delayed until June 2, 1969. This was to permit the Forest Service crews to complete the restaking prior to resumption of work.

It was also agreed that the Alternate Case I borrow source would be staked and a change order issued prior to resumption of work. (Change Order No. 3, dated June 2, 1969.) [8]

The contractor's superintendent indicated that it was the contractor's intention to

* * * proceed immediately with all work available to him and accomplish that work in the shortest time possible and practical.

He also indicated that they might not start with all the equipment and men on June 2, 1969, but that, if not, they would be in full production shortly thereafter.

In the meantime, the dispute regarding the contractor's claim for clearing and grubbing of the Case I borrow source material was taken to the Board of Contract Appeals. While the minutes of the meeting do not specifically mention anything about the contractor's claim with respect to the borrow source material it appears that the intention was to use the alternate borrow source and yet, there was no comment on additional payment to be made to the contractor if the alternate borrow source was used.

The contractor's good faith and bona fide intent to resume and complete the work was illustrated by a statement in the minutes of the May 23, 1969 meeting to the effect that:

Mr. Angell indicated that Discount Company intended to notify the local newspapers of their plans for resumption of work and request the public to stay out of the construction areas. They also intend to place warning signs and barricade the project area.

This entry is made under the heading "public relations." In further elaboration, the minutes state:

In view of the public relations aspect of the project, Mr. Angell was requested to coordinate as much as possible with the Forest Service regarding signing and press releases. A joint effort by both parties can accomplish the purpose and maintain good public relations.

Notwithstanding the intentions of the parties to proceed with the work as soon as

8. No copy of this document found in record.

possible, it was not until June 25, 1969 that a "partial resumption" work order was issued. The document bears a typewritten date of June 2, 1969, but that date was obliterated and a handwritten date of June 25, 1969 was inserted. The order made reference to the prework conference of May 23, 1969 and carries a handwritten note "see Discount letter of 6/24/69" and what appear to be the initials of the COAR.

According to the testimony of the contractor (which appears to be uncontradicted) he proceeded to move equipment into the site on July 2, 1969 pursuant to the order to fully resume work as of June 25, 1969. The contractor testified with respect to his efforts to resume work on July 2, 1969:

> As soon as the equipment was on the site and it was started up, it started up at the boat ramp in preparation to move out the parking area, the COR on the project immediately gave us a work order directing us "no work is to be done on removal and replacement of rejected fills as presently in place in Lookout Point boat ramp and parking lot. This order is issued pending result of negotiations on a proposal being presented to your legal representative by the contracting officer. This proposal involves a conditional acceptance of the fills as placed."
>
> This was signed on the project site by the project superintendent at 3 p. m. in the afternoon, 7/2/69. It was taken immediately down to the equipment supplier and the man who was working bringing the equipment. He was told that he couldn't start up in that area. He signed this also.
>
> They told T & T Logging to stop at 3:15 p. m. They loaded up the loader and moved it out. It's signed by William R. Taylor.
>
> It stopped the operation right there.

Concurrently with the contemplated resumption of work, a controversy was running with respect to the amount of payment due the contractor for work already completed. In particular, the controversy revolved around the percentage of comple-

tion of specific items up to the time of resumption of work in the spring or summer of 1969.

A meeting was held with the contractor in Portland, Oregon, on July 14, 1969, at which time the contractor was advised that a total work resumption notice would be issued effective July 15, 1969. (A certified mail receipt indicates that the notice of total work resumption was received by the contractor on July 17, 1969.)

The work order, effective July 15, 1969, called for:

> Full resumption of work on all phases of the project *excepting* that portion of work, as it pertains to the Lookout Boating Site parking lot and boat ramp, presently being arbitrated * * *

The document indicates that it was issued on July 14, 1969, and was mailed by certified mail to the contractor at P.O. Box 3, Springfield, Oregon 97477 on July 14, 1969. A copy of the notice was also sent to the contractor's attorneys, Robertson and Wills 18448 Southeast Pine Street, Portland, Oregon 97233.

The record does not indicate what transpired during the week following July 15, 1969. However, by letter dated July 23, 1969 the contracting officer placed the contractor on notice that, unless work would be resumed by August 3, 1969 (10 calendar days after *receipt* of the letter, July 17, 1969) "with such diligence as to insure completion of the work within the remaining contract time" (57 calendar days then remaining according to the contracting officer's computations), the Government would have to consider termination of the contractor's right to proceed with the work and subsequently to terminate the contract for default.

The contracting officer's letter of July 23, 1969 which threatened to terminate the contractor's right to proceed and also threatened subsequent termination, failed to make reference to the effort of the contractor to resume work on July 2, 1969. Likewise, no reference was made to the stop order which precluded the contractor from proceeding to take out and replace the

boat ramp and the parking area borrow while the Government was reconsidering its prior refusal to accept those portions of the work. Meanwhile, time was running against the contractor since the partial resumption order was effective June 25, 1969.

Prior to this time, apparently without knowledge of the contractor, the Government had already decided to accept the boat ramp and parking area "as is" and make a contract adjustment accordingly. It was not until later that the contractor was advised that the Government had decided to accept the boat ramp and parking area "as is," thereby relieving the contractor of any further responsibility for that portion of the contract.

Having received the letter of July 23, 1969 from the contracting officer, the contractor met with the COAR on July 29, 1969 to discuss the status of the contract. The contractor indicated that his superintendent had not been furnished adequate information to permit him to resume work and that the matter of payment for work completed had not been resolved.

The contractor also discussed the matter of using the Alternate Case I source for completing the work on the boat ramp and parking area. He was concerned lest he would not be compensated adequately for hauling the fill from the Alternate Case I source since nothing was mentioned in the change order concerning such compensation. He was advised by the COAR that the change order would be revised to provide for compensation. He asked that he be compensated at a rate of 30 cents per cubic yard. The COAR told him that he could see no problems involved in that revision since if this was the only thing standing in the way of resolution of the problem, the Government would be agreeable.

*Even this discussion apparently did not take into account the fact that the Government had already decided to accept the boat ramp and parking area "as is." Otherwise there would have been no reason to discuss the alternate borrow source.*

The contractor thereafter telephoned the COAR on July 31, 1969, requesting a meeting at 4 o'clock that afternoon to discuss the pending claim for payment for work completed. Upon inquiry by the COAR as to the status of the contractor's resumption of work on the project, he was advised by the contractor that work would resume at 8 a. m., Monday, August 4, 1969. It was indicated that the contractor intended to resume work on the waterline construction and the grading of the campground roads. He did not intend at that time, to resume any work on the boat ramp or parking lot, it being understood that such work would not be resumed until the water level was expected to recede in September (the contractor still being unaware of the Government's decision to accept the boat ramp "as is"). The contractor also indicated that work on the waterline could not be resumed before August 4 because his plumbing subcontractor was tied up on another job. Furthermore, the contractor said he could not resume work on the grading until he reviewed the change order, on the site, before any stakes were disturbed.

The meeting was held the afternoon of July 31, 1969, as scheduled. Both the COR and the COAR were present. An agreement was reached as to their differences regarding the percentage of work already completed in connection with the contractor's claim for payment for such work. The contractor was advised that the revised pay estimate would be submitted to him the following Monday morning.

Thereafter, the discussion related to resumption of work. The contractor repeated his earlier representation that waterline construction would start on Monday, August 4, at 8 a. m., and, with regard to clearing and grading, he would take the necessary steps for preparations, starting on Monday, to resume work.

It was further agreed that construction on the water tank would start after the waterline had been tested, the ditch backfilled and access to the site provided. The COAR took the position that all phases of work, *with the exception of the boat ramp,* were available and suitable for resumption of work and that "the Government's posi-

tion was that there was no reason why work could not be resumed in full."

The contractor took the position that he would be prepared for a full resumption of work on all phases *within the next 2 weeks, i. e.,* by August 14, 1969. He further conditioned his representation on the outcome of talks he was to have with his bonding company on August 1, 1969.

The contractor was informed that the COAR and the COR would be present on the site at 8 a. m., Monday, August 4, to determine whether or not a conscientious effort was being made to resume work on the contract. Other minor matters were discussed during the conference, such as the location at which the contractor would dispose of large rocks and other material dug up during correction of the fill slopes. These matters, however, were of no consequence overall.

The COR (Davis) arrived at the site at 8:05 a. m., on August 4, 1969, as scheduled. The contractor's superintendent, Angell, and two employees were there also. Shortly thereafter, the contractor (Norelius) arrived, as did the plumbing subcontractor, Hope, and one employee. All except the COR and Norelius proceeded to repair a break in the 6-inch waterline and to install a T connection which had been omitted in the earlier construction.

The plumbing subcontractor had scheduled ditching of the remainder of the waterline. However, upon reviewing the site on August 3, 1969 (the previous day), he found that the staking was not complete. Thereupon he cancelled the order for the equipment to complete the trenching pending replacement of the missing stakes. The COR and the contractor's superintendent later found adequate stakes in place in the area.

The COAR advised the contractor that approximately 46 calendar days remained for completion of the contract and requested a schedule of completion of the contract. The contractor was reminded of the fact that the 10-day "cure period" prescribed in the letter dated July 25, 1969, had expired but he would be allowed an additional day (to the close of business on Tuesday, August 5, 1969) to furnish a detailed, day-by-day schedule of proposed completion of the contract within the remaining 46 calendar days. The contractor asked that he be allowed until Wednesday, August 6, 1969, to submit the schedule since he would be busy lining up equipment on Tuesday, August 5, 1969. This request was refused by the COAR. *In conclusion, he was informed by the COAR that if he hesitated to resume work and thereby jeopardized completion, the contract would be terminated.*

The record indicates that the contractor was preoccupied with the matter of collection of the money due him for the work already completed. It further appears that the bonding company and the contractor's creditors were likely to be the beneficiaries of any money received, thus virtually eliminating any incentive for the contractor to put out the additional funds to complete the contract.

It is equally evident from the record that the Government was less than fair in its treatment of the contractor in that it held up payment of the amounts due for completed work as a means of forcing the contractor to submit a detailed, written schedule of completion. *There is no indication, however, that the contract would not have been completed within the number of days remaining for completion.*

The contractor, by letter dated August 5, 1969, wrote the COAR as follows:

On the Project this Monday I explained the Methods and procedures that would be used for completing this project with the existing changes and changed conditions. You stated the Government was aware of all conditions and felt that an accellerated [sic] schedule should be implemented. This schedule is under preparation and will be submitted very shortly.

The change orders I received Monday are being processed and appear favorable.

We will continue to proceed diligently with performance of this contract.

If there are any questions, please do not hesitate to contact me.

The letter did not convince the COAR that the contractor's expressed intention to "continue to proceed diligently with performance of this contract" was supported by any overt showing of likelihood of accomplishment. Notwithstanding the contractor's promise to submit "very shortly" an accelerated schedule of completion (already under preparation), the COAR, by letter dated August 7, 1969, warned the contractor that "[v]isible action or lack of action on your part will determine the necessary course of action to be taken by the Contracting Officer."

The record [9] indicates that the contractor telephoned the COAR on the afternoon of August 11, 1969, regarding the payment being withheld by the Government. The COAR could not give an immediate answer as to the status of payment but agreed to call back within an hour (by 3 p. m.). The contractor indicated he would call back in 2 hours (by 4 p. m.). Instead, the contractor's superintendent called the COAR in behalf of the contractor at about 4:30 p. m.

The COAR informed the contractor's superintendent that *payment was being withheld pending the decision by the contracting officer (CO) on termination of the contract,* which decision was expected to be made by noon the next day, August 12, 1969.

At about 8 p. m. the evening of August 11, 1969, the contractor phoned the COAR at his home to obtain verification of the message given him by his superintendent. The COAR verified it and confirmed that he, alone, had made the decision (in the absence of the CO, and with full knowledge of the acting CO) to *withhold payment for completed work pending the decision of the CO on termination.*

The next day (August 12, 1969) the contractor replied to the letter from the COAR, sending a copy to the CO. The letter reads as follows:

> These facts occured [sic] with the pay estimate while you were on vacation and are presented to you for corrective action, as stated in our meeting this morning.

> As you know, pay estimates have been delayed for various invalid reasons on our projects. We have been trying to complete the evaluation agreed to be made at the project site meeting of May 14, 1969. The Forest Service took exception to the results of previous evaluations and on July 31, I met with Mr. Roth and Mr. Davis and using the Forest Service calculations the present evaluation was arrived at.

> I asked for prompt processing of the pay estimate and Mr. Roth said it would be ready Monday August 4th for signing and processing, and it was signed by Mr. Angell and Mr. Davis for processing and payment.

> On August 11th, I phoned Mr. Roth and asked him if this estimate had been processed. He stated he would check on it, later this same day Mr. Angell phoned Mr. Roth and was told this pay estimate was being held up by Mr. Roth pending possible termination of the contract by Mr. Donkel.

> When Mr. Angell informed me Mr. Roth had been holding up this pay estimate, and realizing the deception involved, I phoned Mr. Roth and he then informed me he had retained this pay estimate because we had not notified him of action taken regarding unpaid obligations and claims against the bonds and he was awaiting the decision on terminating the contract. He was therefore not processing this estimate agreed upon July 31, 1969.

> This deception with the pay estimate by Mr. Roth required me to reschedule the planned equipment being moved to the project for a more compatible date. The uncertainty of the Forest Service activities made this necessary.

> The participation of Forest Service Officials to deliberately apply economic

---

9. Memorandum to Files, prepared by COAR on August 14, 1969 (3 days after the occurrence of the events recited therein and 2 days after the "Notice of Termination" was sent to the contractor).

pressure in this deceitful manner of holding up pay estimates, which the Forest Service apparently did not intend to honor, certainly is unethical and deceitful and requires corrective action.

On August 4th at the project Mr. Roth demanded an accelerated performance schedule by the next day. I told him the time allowed was unrealistic to prepare a detailed schedule but would have one within two weeks. The answer to his letter of August 7, 1969 is being prepared also.

On August 14, 1969, the contractor wrote a separate letter to the CO, sending a copy to the COAR. The full text of this letter is as follows:

In reply to your letter of August 7, 1969, the facts should have been stated by you more accurately.

You observed that we were proceeding diligently in the only area available for us to proceed in an orderly sequence, because the Forest Service had not provided the essential cooperation and follow up of their agreements promised us, so construction could prevail in an orderly manner in a continuous effective operation.

Men and equipment would have been performing on the parking area water installation system had the Forest Service completed the staking they assured us they would do. However, water line work was being performed in the only areas available, to the tank site.

The builder will complete his work when the tank site is available for work after this section of water line is completed.

Boat Ramp and Parking Area work was curtailed because high water made it hazardous, and impractial [sic] to perform work there.

In the campground on Monday August 4, 1969 was the first time the changes were inspected jointly, even though we had previous [sic] requested your cooperation to review these changes, to facilitate prompt resumption of contruction [sic]. Construction could not feasibly proceed until this joint inspection of campground changes.

The above was adequately explained to you on the project, and you acknowledged understanding the conditions created by the Forest Service, I was thereby astonished when your letter did not indicate the correct discussion. It appears that your prejudice overcomes a proper judgement [sic] of this project.

As of August 14, 1969, the contractor apparently had not received the "Notice of Termination" issued by the CO on August 12, 1969. The text of that notice is as follows:

Reply to: 6320 Contracting        August 12, 1969

Subject: Notice of Termination, Mona Campground and Lookout Boating Site, Bid No. R6–68–183, Contract No. 002112

To:      Discount Company
        P.O. Box 17272
        Portland, Oregon 97217

CERTIFIED MAIL—RETURN RECEIPT REQUESTED

By Certified Mail, dated July 23, 1969, and receipted for by E. E. Angell, Vice-President and Project Superintendent, at 8:30 a.m. on July 24, 1969, you were advised "we are placing you on notice that if work has not been resumed on this contract within ten calendar days after receipt of this letter with such diligence as to insure completion of the work within the remaining contract time, we will have to consider termination of your right to proceed with the work, and subsequently terminate the contract for default."

The ten-day period specified for returning to work expired August 3, 1969. During this period you did not perform any work on the project site. Subsequent to this period you have only performed minor work testing and repairing previously installed water lines. The extent of this work is inadequate evidence of the diligent performance required.

The letter of July 23, 1969 reiterated some of the events and circumstances related to your failure to return to work on this project during the current work season which are cause for the termination of this contract for default.

Subsequent to the expiration of the cure period allowed on August 4, 1969, you met with Wm. H. Roth, Contracting Officer's Administrative Representative on the project site to discuss your possible return to work. The documentation of this meeting was sent to you by Mr. Roth's letter of August 7, 1969. A copy of this letter is attached. To date you have not furnished the Government with any proposed schedule of your plans for completion of this project to in any manner assure us of possible completion within the remaining contract time.

As of the close of business this date you have not resumed work in such a manner as to assure completion of this contract within the remaining contract time. Considering these facts, it is my determination to terminate this contract for default.

Your right to proceed further with the performance of the contract is terminated effective at close of business this date, August 12, 1969, or date of receipt of this notice, or notification thereof, whichever is later.

The Government may cause the contract to be completed and you, the contractor, will be held liable for any increased costs.

The Government reserves all rights and remedies provided by law and under the contract, in addition to charging increased costs.

This notice constitutes my decision, pursuant to the Disputes clause, that you are in default as specified and I have determined that your delay in prosecution of the work is not excusable.

This decision is made in accordance with the Disputes clause and shall be final and conclusive as provided therein, unless, within thirty days from the date of receipt of this decision, a written notice of appeal addressed to the Secretary of Agriculture is mailed or otherwise furnished to the Contracting Officer. The notice of appeal, which is to be signed by you as the contractor or by an attorney acting on your behalf, and which may be in letter form, should indicate that an appeal is intended, should refer to this decision and should identify the contract by number. The notice of appeal may include a statement of the reasons why the decision is considered to be erroneous.

ROBT. L. DONKEL
Contracting Officer

cc: Robertson & Wills
Attorneys at Law
18448 S. E. Pine
Portland, Oregon 97233

United Pacific Insurance Co.
415 S. W. 10th Avenue
Portland, Oregon 97201

Discount Co.
P. O. Box 3
Springfield, Oregon 97477

COR Charles Davis, Willamette NF
COAR William H. Roth, Willamette NF
Willamette NF (B&F)
Willamette NF (6320)

It is in the context of the foregoing climax to the contentious relationship between the contractor and the Government representatives that the ultimate issue must be decided. Due regard being given to the Board's findings of fact in this case, the court must ultimately decide whether or not the Board erred in refusing to hold, as plaintiff urges, that the termination for default should be treated as a termination for convenience of the Government.

The August 14, 1969 memorandum of the COAR's recollection of this telephone conference (see note 9), perhaps more than any other single document in the case, places in focus the ultimate issue in this case.

The question comes down to this:

May the Government withhold payment of amounts due for completed work, yet terminate the contract unilaterally for failure of the contractor to submit, by a specified date, a "detailed plan for accomplishment of the remaining work within the remaining contract time" in the absence of evidence which would clearly establish impossibility of completion on time?

## II. *Summary of the Law*

No case has been cited by the parties which is more nearly in point than this court's decision in *Dale Constr. Co. v. United States,* 168 Ct.Cl. 692 (1964). In that case the court, *per curiam,* adopted the opinion, findings and recommendation of the "trial commissioner." The essential portions of that opinion are summarized hereinafter.

Dale contracted with the Army to replace a 16-inch cast iron water main at the Boston Army Base with a new main made up of a combination of 16-inch cast iron pipe and 16- and 12-inch cement-asbestos pipe. Start of the contract was delayed due to unavailability of the cast iron pipe. However, construction was ultimately started, using the available cement-asbestos pipe pending availability of the cast iron pipe. Further delay was caused by the failure of the Boston City Water Department to close a specified valve (the specified valve being imbedded in the street, and therefore not visible) before excavation was commenced. When excavation was commenced, the trench and adjacent areas were flooded. The contractor's claim for his loss due to the flooding and delay was denied by the CO.

Dale continued work on the cement-asbestos pipe section until freezing weather (at the end of December) necessitated cessation of the work. The work was resumed, however, the following March.

There followed other delays such as the refusal of the Army to prevent its employees from using the work area as a parking lot. Without enumerating all the other claims for delay, suffice it to say that the relationships between the contractor and the Government representatives deteriorated to the point that all communications between the contractor and such representatives had to be channeled through the office of the CO.

Finally the contractor and the Government representatives reached an impasse. The crisis arose over the matter of installing sheathing in the trench in which the pipe was installed. On the same date the contractor wrote to the CO concerning resumption of work, the CO sent the contractor a letter terminating the contract for default and terminating further performance under the contract.

In reaching the conclusion that there was no justification for cancelling the contract for default, the "trial commissioner" stated:

> Withal, it appears that the major reason for the termination was not the contractor's lack of diligence but rather its submission on January 12, 1952, of a claim for extras. * * * [*Dale Constr. Co. v. United States, supra,* at 720.]

The facts in the present case are somewhat analogous to those in *Dale, supra.* In the present case the contractor had a claim pending for payment of work completed and a claim for additional payment for moving material from the alternate borrow source. Also, the matter of acceptance of the boat ramp "as is" was under negotiation.

In the present case there is also evidence of antagonism between the contractor and the Government representatives. The record indicates that one Government employee with whom the contractor had difficulties was taken off the job in order that the conflict would cease.

Finally, the CO in the present case made no finding that the contractor was actually in default on any item. His only ground for termination was that there was "inadequate evidence of the diligent performance required." In further elaboration on this point, the CO stated that "some of the events and circumstances related to your failure to return to work on this project during the current work season which are cause for the termination of this contract for default" were set forth in the 10-day "cure" letter of July 23, 1969.

In a somewhat redundant and petulant manner, the CO stated in the notice of termination:

> * * * To date you have not furnished the Government with any proposed schedule of your plans for completion of this project to in any manner

assure us of possible completion within the remaining contract time.

The notice went on to say:

> As of the close of business this date you have not resumed work in such a manner as to assure completion of this contract within the remaining contract time. Considering these facts, it is not my determination to terminate this contract for default.

Nothing was said in the letter about payment for completed work, the acceptance of the boat ramp "as is," or any other matters outside those referred to in the "cure" letter of July 23, 1969.

Another precedent of this court which is applicable to the present case is *Schlesinger v. United States,* 390 F.2d 702, 182 Ct.Cl. 571 (1968).

In *Schlesinger,* a "cure" letter was sent to the contractor which concluded with the following paragraph:

> This letter notice is your first warning concerning delinquency in deliveries of Caps, service, under the subject contract. You are requested to immediately advise the Contracting Officer the specific dates on which deliveries can be expected. Upon receipt of the information further determination will be made regarding the status of your contract.

Without making a finding that the contractor would not have been able to complete the contract within the time allowed, the Government thereafter terminated the contract for default. The Armed Services Board of Contract Appeals sustained the termination for default but the Court of Claims held that the termination should be for the convenience of the Government. It is clear from the court's opinion that the Government seized upon a technicality to terminate the contract for default, whereas exercise of sound discretion would have dictated termination for convenience of the Government under the facts in the case.

By analogy, the CO in the present case seized upon a technicality as an excuse to "get rid of the contractor." The technicality in this case, as in *Schlesinger, supra,* was the failure to submit a written schedule for completion of the work—and nothing more. Nowhere in the contract in the present case is there a provision for submission of completion schedules other than those required at the time of commencement of the work (Contract § 4.3).

The present case is readily distinguishable from those cases in which the contractor was already in default at the time of issuance of the "Notice of Termination" by the CO.[10] This is a case in which the CO *anticipated* a default but without making a determination that the contractor could not possibly complete the work *within the time remaining.*

Finally, the CO was not lawfully entitled to withhold payment of sums due the contractor for work completed or to pay over such sums to the bonding company where the contractor was not already in default or where there is insufficient evidence to establish that the work could not possibly be completed within the time remaining.

In *Hicks Corp. v. United States,* 487 F.2d 520, 203 Ct.Cl. 65 (1973), the contractor closed its plant due to lack of operating funds and thus was in default at the time of termination. Thus the CO was justified in terminating the contract for cause.

The contractor in the present case was obviously in a financial "bind." The bonding company and some creditors had made known to the Government their concern over the ability of the contractor to fulfill his financial obligations. They showed no concern, however, over the ability of the contractor to *complete the work* within the remaining time. They were only concerned about the cash flow. To this extent, the Government was at fault for deliberately withholding the amounts due the contractor for work completed. Had such amounts been paid, the concern of the bonding com-

---

10. *See, e. g. Litchfield Mfg. Corp. v.*

pany and creditors of the contractor may have been alleviated or, perhaps, eliminated.

Beyond a shadow of doubt, the attitudes and actions of the CO in terminating the contract, and the Board in affirming the termination, reflect a prejudice against the contractor arising out of a pending controversy with the same contractor over another contract which was also terminated for default, but was ultimately converted to termination for convenience of the Government after appeal.[11] Indeed, the decision of the Board from which the present appeal has been taken clearly states:

> The difficulties at North Waldo experienced by appellant and for which this Board found that the Government was responsible undoubtedly had some effect upon appellant's difficulties in the contract which is the subject of this appeal.
> * * *

The fundamental error of law in the Board's decision in this case lies in its statement that:

> It is not a sufficient answer that there was adequate time left for completion. It seems clear that at the time of termination there was adequate time left for completion. * * *

The Board stated further:

> * * * There is no evidence in this appeal showing a connection between the failure to prosecute the work and financial difficulty arising out of Government action on this contract or on the contract in Appeal No. 291, *supra.*

Since there was adequate time left for completion of this contract at the time of termination and the Government not only wrongfully withheld payment of amounts due the contractor for work completed, but also wrongfully terminated the contract in Appeal No. 291, *supra,* the finding of the Board that there was no "connection between the failure to prosecute the work and financial difficulty arising out of Government action" is contrary to the evidence and is, therefore clearly erroneous.

In its "Ruling on Motion for Reconsideration," the Board stated:

> Appellant affirmatively states that it was not prevented from performing because of any financial difficulties which were found to exist with respect to the appeal in Discount Company, AGBCA No. 291, 74–1 BCA ¶ 10,511, involving construction of the North Waldo Lake Campground. Although, the decision of the Board in this case (AGBCA No. 273) referred to those matters, the Board concluded that termination for default was warranted for other reasons. The Board specifically found that the Government was not responsible for failure of appellant to proceed diligently with prosecution of the Mona Campground and Lookout Boating Site contract.

The Board does not explain the "other reasons" for which it concluded that the termination for default was warranted in *this* case. The financial problems of the contractor appear to be the *only* reasons for the alleged lack of progress toward completion. Some equipment was still on the site at the time of termination and there is no evidence that the contractor had gone out of business. Neither is there any evidence that any subcontractor refused to proceed with work on the site.

A cursory review of the administrative record in this case indicates that, due to the co-pendency of the appeals with respect to termination of the Waldo Lake contract and the present (Mona Campground and Lookout Boating Site) contract, the Board's decision in the present case was based on facts which would not, under applicable rules of evidence, be admissible in the present case, alone. Thus, the Board's *decision* in *this* case is not supported by *evidence* which is properly admissible in *this* case.

In view of all of the foregoing, I believe that the termination was and should be denominated as termination for convenience of the Government and not as a termination for default.

---

11. Discount Co., AGBCA No. 291, 74–1 BCA ¶ 10,511.