61 F.3d 920
 1995-2 Trade Cases P 76,817, 40 Cont.Cas.Fed.
(CCH) P 76,817
NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
Frank D. MINELLI, d/b/a Swiss Craft Professional Painters,
Plaintiff-Appellant,
v.
The UNITED STATES, Defendant-Appellee.
 No. 95-5018.
 United States Court of Appeals, Federal Circuit.
 July 18, 1995.
 
 Before RICH, LOURIE, and BRYSON, Circuit Judges.
 DECISION
 BRYSON, Circuit Judge.
 
 
 1
 Frank D. Minelli, sole proprietor of Swiss Craft Professional Painters, appeals the order of the United States Court of Federal Claims, Docket Nos. 90-228C and 90-4047C, in which the court held, on summary judgment, that the government acted lawfully when it terminated its contract with Swiss Craft for default. We affirm.
 
 BACKGROUND
 
 2
 On February 19, 1988, the Army Corps of Engineers awarded a contract to Swiss Craft to sandblast and paint 30 reservoir control gates on the W.D. Mayo and Robert S. Kerr Dams in Oklahoma. Swiss Craft received the Corps' notice to proceed with the work on June 13, 1988, but because Swiss Craft was occupied with other projects, it did not begin work until March 23, 1989. Under the terms of the contract, Swiss Craft was required to complete the work at the Mayo Dam by October 15, 1989, and at the Kerr Dam by July 22, 1990.
 
 
 3
 Even after Swiss Craft began working on the project, its progress was halting at best. From the outset, the Corps warned Swiss Craft about a number of safety violations and directed that the violations be corrected. Swiss Craft failed to remedy the deficiencies, and on April 24, 1989, the contracting officer's representative ordered Swiss Craft to stop work because of the violations.
 
 
 4
 On May 11, 1989, Swiss Craft sent the Corps a letter advising that it had corrected the safety violations, and the next day the Corps advised Swiss Craft that it could resume working. During safety inspections in late May and early June, however, the Corps' district safety engineer discovered additional safety violations, which he characterized as "eminently dangerous." On June 9, 1989, the Corps therefore again ordered Swiss Craft to stop work because of safety violations. By June 29, 1989, Swiss Craft had corrected most of those violations, and on July 7, the Corps lifted the work stoppage on the condition that Swiss Craft correct the remaining minor violations.
 
 
 5
 Between March 23 and the end of June, 1989, Swiss Craft had painted two of the Mayo Dam gates. When Swiss Craft presented those gates to the Corps for acceptance, however, the Corps rejected them for failing to conform to the contract's specifications. The Corps directed Swiss Craft to redo all the work on those two gates, including re-sandblasting the steel surfaces. By the end of June 1989, then, Swiss Craft had effectively completed none of the work under the contract satisfactorily, it had suffered several lengthy work stoppages because of continuing and serious safety violations, and only three and one-half months (out of the 16-month period available under the contract) remained within which to do all the work on the Mayo Dam.
 
 
 6
 On June 30, 1989, the contracting officer sent Swiss Craft a cure notice stating that Swiss Craft would be terminated for default unless it provided within ten days "a comprehensive responsive written plan evidencing your commitment and program for completing the work in accordance with the contract specifications." In its response, Swiss Craft proposed to use a subcontractor to complete the bulk of the work on the 12 Mayo Dam gates. By using a subcontractor, Swiss Craft estimated that it could complete the bulk of the work on the Mayo Dam by October 14, 1989, assuming that there were no further safety-related work stoppages and that there would be no need to redo any of the work. Swiss Craft proposed that the work on the service bridges and gate hoist machinery would be completed in the winter of 1990, after the period specified in the contract.
 
 
 7
 In a second submission, dated July 11, 1989, Swiss Craft informed the Corps that unless the contracting officer waived the contract provision prohibiting painting whenever the temperature of the painting surface exceeded 95 degrees, Swiss Craft would be "forced to shut this job down for the remainder of July and August." In a July 13, 1989, meeting with the Corps, Swiss Craft reiterated its request that the contract requirements be relaxed in various ways, including allowing painting to proceed as long as the painting surface did not exceed 125 degrees, allowing the painting of service bridges in January and February 1990, modifying the specification regarding the time lapse between the primer and second coats of paint, accepting one of the previously rejected gates, and agreeing to permit a subcontractor to complete the work on the project. In a letter dated July 15, 1989, Swiss Craft advised the contracting officer that the proposed subcontractor had taken the position that it would not be able to take over the job if the temperature limitations in the contract were not modified.
 
 
 8
 On July 18, 1989, the contracting officer terminated the contract for default. The contracting officer explained that the conditions Swiss Craft had set forth in response to the June 30 cure notice concerning the relaxation and modification of various contract specifications were unacceptable. Minelli then filed this action in the Court of Federal Claims, contending that the contracting officer had abused his discretion by terminating the contract for default. The Court of Federal Claims granted the government's motion for summary judgment and dismissed Minelli's complaint.
 
 DISCUSSION
 
 9
 A contracting officer may terminate a contract for default if there is "no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance." Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 765 (Fed.Cir.1987); see also Discount Co. v. United States, 554 F.2d 435, 441 (Ct.Cl.), cert. denied, 434 U.S. 938 (1977). Minelli argues that because Swiss Craft was willing and able to fulfill its obligations under the contract, the contracting officer should not have terminated the contract for default. In particular, Minelli points to the schedule that Swiss Craft included with its July 10 letter, in which Swiss Craft promised to complete work on the Mayo Dam gates by October 14, 1989; Minelli contends that the contracting officer had no reason to doubt that Swiss Craft would adhere to that schedule.
 
 
 10
 The Court of Federal Claims rejected Minelli's argument in a thorough opinion on which we rely. The court reviewed the late start-up, the delays resulting from Swiss Craft's numerous safety violations, and the poor quality of the work done by Swiss Craft as of the end of June 1989. At that time, as the court put it, "Swiss Craft found itself in the position of having to re-paint the only two gates that it had managed to paint up to that time. In short, its progress had been zero."
 
 
 11
 The trial court noted Swiss Craft's position in July 1989 that, absent relief from the painting surface temperature restriction in the contract, no work would be done in July and August. Moreover, as of July 18, 1989, only 90 days remained in which to complete work on the Mayo Dam, yet all 12 gates remained to be painted. That period was insufficient even under Swiss Craft's estimate of an average of 10 to 12 days for painting each gate. Under those circumstances, the trial court concluded that as of the date the termination was announced, the likelihood that the gates and associated structures at the Mayo Dam would be painted within the period specified in the contract "bordered on zero."
 
 
 12
 We concur in the trial court's analysis. Although termination for default is an extraordinary remedy that should not be invoked lightly, the contracting officer was justified in concluding that Swiss Craft would not be able to complete its obligations under the contract relating to the Mayo Dam, consistent with the contract specifications, by the October 15, 1989, completion date. Swiss Craft's submissions to the contracting officer in July 1989 made it clear that it would not be able to complete the Mayo Dam work on time without waivers of certain contract specifications--most importantly, the specification regarding the temperature of the painting surface. Because the contracting officer was not willing to relax the contract specifications and had no obligation to do so, he reasonably concluded that Swiss Craft would not be able to adhere to the schedule that it proposed in July 1989.
 
 
 13
 Minelli argues that Swiss Craft was willing to do the work on the Mayo Dam in a timely manner and that the trial court erred by disregarding the evidence to that effect. Minelli, however, ignores the fact that Swiss Craft made its promise of timely performance contingent upon the contracting officer's willingness to waive various specifications of the contract. As the trial court observed, Swiss Craft's response to the contracting officer's cure notice was thus not a demonstration of willingness and ability to perform, but rather an admission that it could not perform to the contract specifications in a timely manner.
 
 
 14
 Minelli correctly notes that adverse weather days would have extended the date by which Swiss Craft was obligated to complete the work. Yet even with the completion date extended by one day for each day of adverse weather, as the contract provided, Swiss Craft could not realistically expect to finish the Mayo Dam work on time, as it had only 90 days to paint 12 gates, which by its own estimates would take a minimum of 120 days to complete.
 
 
 15
 In his brief, Minelli cites the deposition testimony of a Corps representative for the proposition that even without taking into account excusable weather-related delays, Swiss Craft could have timely completed the Mayo Dam work. The deposition testimony, however, does not support that assertion. The representative was asked whether, if Swiss Craft had demonstrated its willingness and ability to complete the job in accordance with the contract specifications, he would have been concerned about Swiss Craft's ability to complete the job on time. In response to that circular question, the Corps representative naturally said he would not. The problem is that Swiss Craft had not demonstrated its willingness and ability to complete the job in accordance with the contract specifications. Rather, Swiss Craft was insisting on modifications to the contract as a condition for the timely completion of the gate-painting work at the Mayo Dam. Moreover, as the trial court observed, the contracting officer was entitled to take into account Swiss Craft's performance during the first 13 months of the contract in assessing whether its projected performance during the last three months was realistic. Swiss Craft had started the work nine months late; it had lost almost two months' working time due to safety violations; and because of unsatisfactory performance up to that point, much of the work would have to be redone. Under those circumstances, the contracting officer was entitled to be skeptical of Swiss Craft's projections regarding future performance.
 
 
 16
 Finally, Minelli argues that the default termination must be overturned because the contracting officer did not explicitly consider several factors that the Federal Acquisition Regulation directs contracting officers to consider before terminating a contract for default. See 48 C.F.R. Sec. 49.402-3(f). Those factors, such as whether a termination for default would adversely affect other government contracts, whether the supplies or services could be obtained from other sources, and whether those supplies or services could be obtained from other contractors more quickly than from the delinquent contractor, raise considerations that may lead a contracting officer to conclude that, despite the contractor's default, it is in the government's interest to bear with the contractor and forgo a default termination.
 
 
 17
 The section 49.402-3(f) factors inform the contracting officer's exercise of discretion in circumstances in which a default is legally justified. Section 49.402-3(f), however, was not designed to benefit contractors, and therefore does not create any rights in contractors. See, e.g., William A. Hulett, 93-1 B.C.A. (CCH) p 25,389, at 126,459 (1992); Michael Chuprov dba Release Reforestation, 87-2 B.C.A. (CCH) p 19,778, at 100,086 (1987); Spectrum Leasing Corp., 85-1 B.C.A. (CCH) p 17,822, at 89,199 (1984). To be sure, a contracting officer's failure to consider the section 49.402-3(f) factors may shed light on whether the contracting officer has abused his discretion by precipitously terminating the contract for default. See Darwin Construction Co. v. United States, 811 F.2d 593, 598 (Fed.Cir.1987); Lafayette Coal Co., 89-3 B.C.A. (CCH) p 21,963, at 110,482 (1989); International Electronics Corp., 76-1 B.C.A. (CCH) p 11,817, at 56,430 (1976). Under the circumstances of this case, however, it is clear that the contracting officer did not abuse his discretion, and any failure on his part to consider the section 49.402-3(f) factors does not undermine that conclusion.