The **HICKS CORPORATION**
v.
The **UNITED STATES.**
No. 22–71.

United States Court of Claims.
Nov. 14, 1973.

Michael J. Rubin, Washington, D. C., with whom was Acting Asst. Atty. Gen., Irving Jaffe, for defendant.*

Before DAVIS, NICHOLS and KUNZIG, Judges.

PER CURIAM:

This case comes before the court on plaintiff's request, filed April 16, 1973, for review by the court of a recommended decision filed by Trial Judge George Willi pursuant to Rule 166(c) on March 20, 1973. The court has considered the case on the record and the briefs of the parties. Since the court agrees with the decision of the trial judge, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover and its petition should be dismissed; that judgment in the amount of $55,067.57 should be entered for defendant on its first counterclaim; and, that defendant's second,

third, fourth and fifth counterclaims are remanded to the trial judge for further proceedings of an appropriate nature. Plaintiff's petition is to be dismissed and judgment is to be entered for defendant on its first counterclaim at the conclusion of the proceedings remanded to the trial judge.

## OPINION OF TRIAL JUDGE

WILLI, Trial Judge:

By cross-motions for summary judgment the parties present a single issue common to four of the six counts of the petition herein. It is the correctness, subject to the finality standards of the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321–322 (1964), of three decisions of the Armed Services Board of Contract Appeals (Board) upholding the default termination of four contracts for the supply of various missile components to the Army and Navy. The Hicks Corporation, 67–1 BCA ¶¶ 6303, 6304 and 6305.

Except to the limited extent hereafter discussed, plaintiff's attack on the subject decisions totally lacks the substantive particularity essential to an efficacious challenge. For the most part, both its pleadings and moving papers simply adumbrate those statutory factors and ultimate circumstances for which the Wunderlich Act, *supra*, would deny finality to a board decision. That approach is insufficient, as a matter of law, to bring the merits of such a decision into issue. Sundstrand Turbo v. United States, 59–60, 389 F.2d 406, 422–423, 182 Ct.Cl. 31 (1968).

Each of the four contracts mentioned above may be correlated with the particular count of the petition to which it relates and to the Board decision rendered in respect to it as follows:

Count II: Army Contract No. DA–01–021–AMC–10604(Z): 67–1 BCA ¶ 6305

---

* On June 15, 1973, the court allowed the motion of plaintiff's former attorney of record to withdraw as such from the case. No appearance of counsel was made for plaintiff at the time of submission of the case to the court and there was no oral argument.

Count III: Army Contract No. AMC(Z)01–021–64–11572(Z): 67–1 BCA ¶ 6305

Count IV: Navy Contract No. NOw 63–0530–f: 67–1 BCA ¶ 6303

Count V: Navy Contract No. NOw(Z) 63–0376–f: 67–1 BCA ¶ 6304

██ In each of these counts plaintiff relies on the same two factors to excuse its acknowledged failure to make progress because of lack of capital. First, it urges that working capital was impaired by the additional costs and inefficiencies engendered by the Government's change, while performance was under way, from 100 percent inspection to lot sampling and its withdrawal of Government in-plant inspectors during the second and Saturday work shifts. Neither of these actions exculpates the defaults that followed. Plaintiff neither contends, nor do the contractual inspection provisions suggest, that the Government was required to provide the services of resident inspectors for the second, Saturday or any other of plaintiff's work shifts. As to the change in inspection method, the Board correctly pointed out that each of the contract's standard inspection clauses expressly authorized the lot sampling of which plaintiff complains. 67–1 BCA ¶ 6304 at 29,179. Government conduct authorized by the terms of a contract cannot serve either to excuse the contractor's failure to perform or to create for him an actionable claim for money damages or other relief.

██ The second allegedly unwarranted source of capital impairment invoked by plaintiff to justify its inadequate performance progress is set forth in Count I of the petition. There plaintiff recites the difficulties experienced in attempting to perform an earlier (1962) Army contract, No. DA–01–021–ORD–13055, for the supply of Nike rocket motor cases. In a decision rendered November 12, 1964, at which time the four contracts detailed in Counts II through V were outstanding, the Board found certain specifications of that contract to be defective and remanded the matter to the contracting officer for determination of an appropriate adjustment in contract price. 65–1 BCA ¶ 4516.

On December 18, 1964, while the parties were negotiating the amount of the equitable adjustment, plaintiff closed its plant for lack of operating funds. On January 5, 1965, plaintiff was paid $48,720 by the contracting officer. Although it appealed the adequacy of that payment, it used the money to reopen its plant on January 11, 1965.[1] On March 22, 1965, while the appeal was pending, the contracting officer increased the equitable adjustment by $64,040.62. Plaintiff again appealed and in a supplementary decision of March 18, 1966, the Board held that the adjustment should be still further increased by $53,249, which amount was paid that date. 66–1 BCA ¶ 5469.[2]

Meanwhile, on May 6, 1965, plaintiff had again closed its plant for lack of working capital and this time the closing was permanent. It was this closing that precipitated the default termination of each of the four contracts represented in Counts II through V. A survey of plaintiff's financial condition following the plant closing disclosed that while it was due $19,571 on unpaid vouchers for finished goods that had been delivered and had $33,109 outstanding on unpaid progress payment billings, it had a current balance of unliquidated progress payment receipts totaling more than $660,000 and had been paid some $54,000 [under Army Contract 10604 (Count II)] for 270 rocket motor adapters that it had not delivered. All of these matters are chronicled in the Board's opinion affirming the default

---

1. Both the plant closing and subsequent reopening are reflected in the Board's opinion dealing with the default termination of the two Army contracts involved in Counts II and III. 67–1 BCA at 29,180.

2. In the present proceeding plaintiff makes no substantive effort to impugn that decision as representing less than full redress of the defective specification problem.

termination of the two Army contracts detailed in Counts II and III of the petition herein and are not presently disputed by the plaintiff. 67–1 BCA ¶ 6305. In that opinion, speaking of those two Army contracts in addition to the two basically contemporaneous Navy contracts (Counts IV and V) that were similarly defaulted, the Board concluded: (1) that insufficient operating capital was the effective cause of plaintiff's May plant closing and its consequent inability to make progress on all of the defaulted contracts; (2) that performance could only have been resumed by the infusion of additional Government credit; (3) that such assistance was discretionary with the contracting officer; and (4) that his refusal to extend more credit in an attempt to recoup prior unliquidated advances could not be deemed an abuse of discretion under the circumstances. 67–1 BCA at 29,181.

The thrust of plaintiff's contention respecting the Government's alleged tardiness in fully redressing the defective specification problem encountered under the 1962 Army contract framed in Count I is that the four default terminations effected in the summer of 1965 for an undisputed failure to make progress because of a lack of working capital cannot be permitted to stand since at that time the Government still had not paid the $53,249 that the Board ultimately found due in March 1966 (66–1 BCA ¶ 5469) in furtherance of its prior liability determination of November 1964. 65–1 BCA ¶ 4516. Assuming, but not deciding, that the contracting officer should have voluntarily paid plaintiff this additional sum at the time that he allowed the equitable adjustments totaling more than $112,000 in January and March 1965, pursuant to the Board's remand, the failure to do so can only bear relevantly on the termination that followed if it be concluded that $53,000 would likely have prevented the plant closing

that occurred in May, Preuss v. United States, 412 F.2d 1293, 1299, 188 Ct.Cl. 469, 480 (1969); H & H Mfg. Co. v. United States, 168 Ct.Cl. 873, 879–880 (1964). The record lends no support to such an inference.

Leaving aside the significance of the unliquidated progress payments that had been accumulated under various contracts and reached a balance of over $660,000 by May 1965, an additional receipt of $53,000 at that time would not have increased working capital because it would have been preempted by plaintiff's existing indebtedness of $54,000 represented by the payment that it had received under Army Contract No. 10604 (Count II) for 270 Nike missile adapters that it had never delivered.

Finally, the Board record pertaining to Navy Contract No. 63–0376–f (Count V), 67–1 BCA ¶ 6304, included a letter of May 20, 1965, from plaintiff's president to the Navy in which he undertook to outline the background of the firm's financial plight. He explained that the company had experienced such severe stress over a span of the prior two years[3] that the controlling shareholder had been moved to advance it $850,000, " * * * in spite of what [had] been demonstrated to him as a hopeless situation * * * " and had within the last ten days advanced $100,000 to pay employment and real estate taxes. The history and extent of financial duress recounted by plaintiff's president clearly refute the notion that $53,000 could have meant the difference between sinking and swimming in the summer of 1965. In sum, there was more than substantial record support for the Board's conclusion that a fresh infusion of Government credit would have been plaintiff's only salvation. Koppers Co. v. United States, 405 F.2d 554, 559, 186 Ct.Cl. 142, 150–51 (1968). Accordingly, the Board's approval of the default termina-

---

3. There is reason to believe that, in fact, the deterioration of plaintiff's financial condition had even earlier beginnings. In the late fifties its resources were being appropriated to the personal gratification of its then president and controlling shareholder. Hicks Co., 56 T.C. 982, aff'd, 470 F.2d 87 (1st Cir. 1972).

tions disputed by Counts II through V of the petition must be upheld.

■■ Count VI of the petition refers to a 1963 Army supply contract, No. DA–01–009–AMC–21(Z), for Honest John missiles and related parts. Plaintiff avers that defendant breached this contract by altering its inspection procedures in the same manner as previously described herein with respect to the four defaulted contracts. Further, it alleges that it appealed the contracting officer's denial of redress for these Government actions and that, by an order of October 3, 1968, the Board dismissed the appeal, designated as Docket No. 11003. Examination of the Board record in that matter discloses that the referenced order was a dismissal of the appeal with prejudice and that the action was taken in pursuance of a letter request of September 30, 1968, from plaintiff's attorney stating, in substance, that plaintiff had elected to submit that appeal and six others to the Army and Navy Adjustment Boards for relief under Pub. L. 85–804 (50 U.S.C. § 1431 et seq.) and was therefore " * * * willing to withdraw the subject cases with prejudice, to demonstrate to the Army and Navy Contract Adjustment Boards that [it] has no recourse to legal relief." By its action plaintiff voluntarily and irrevocably extinguished its rights to sue on the contract and, while the record does not reflect how it fared before the Army Adjustment Board on this contract, action on such a claim is entirely discretionary in any event. Winder Aircraft Corp. of Florida v. United States, 412 F.2d 1270, 1272, 188 Ct.Cl. 799, 802 (1969).

The foregoing disposes of plaintiff's assorted claims.

Defendant's answer, in addition to denying liability on plaintiff's claims, set up five separate counterclaims. Plaintiff filed a reply pleading, generally denying the various liabilities asserted against it.

The first counterclaim is for entry of judgment for excess reprocurement costs totaling $55,067.57 incurred in respect to completion of the defaulted contracts involved in Counts II and III of the petition. Following plaintiff's unsuccessful appeal on the termination question, the Board upheld the contracting officer's assessment of these costs. 67–2 BCA ¶ 6684. Plaintiff presents no direct challenge to that determination, contending only that its validity depends upon that, heretofore affirmed,[4] of the default terminations. In these circumstances the Government is entitled to judgment on its first counterclaim. Astro-Space Laboratories, Inc. v. United States, 470 F.2d 1003, 200 Ct.Cl. 282 (1972).

■ The second and third counterclaims are for the recovery of unliquidated progress payments assertedly advanced under the Count IV and V contracts, respectively, and the fourth and the fifth deal with amounts allegedly due under contracts wholly extrinsic to this suit. Defendant's motions for summary judgment on these four counterclaims must be denied for lack of ripeness. In the face of the denials in plaintiff's reply pleadings, defendant has not accompanied its motions by affidavits or other appropriate materials reasonably refuting the existence of material issues of fact subject to genuine dispute. It therefore has not been able to show that it is entitled to judgment as a matter of law.[5] Marley v. United States, 423 F.2d 324, 331–334, 191 Ct.Cl. 205, 218–222 (1970). Accordingly, disposition of defendant's second, third, fourth and fifth counterclaims must

---

4. 67–1 BCA ¶ 6305.

5. While it is recognized that in both its papers supporting its summary judgment motion and replying to defendant's cross-motion plaintiff asserts that the validity of defendant's second and third counterclaims is dependent upon the validity of the default termination of the two contracts (Counts IV and V) from which they stem, it is not felt that the concession of counterclaim liability implicit in a literal reading of these assertions is sufficient to either satisfy or displace the burden of proof resting on defendant as an applicant for affirmative relief.

await further proceedings reasonably adapted to that end.

## CONCLUSION

For the reasons given, the petition should be dismissed; judgment in the amount of $55,067.57 should be entered for defendant on its first counterclaim and defendant's second, third, fourth and fifth counterclaims are remanded to the trial judge for further proceedings of an appropriate nature.