**D. MOODY & CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 296–83C.**

United States Claims Court.

April 4, 1984.

As Corrected April 5, 1984.

Joseph J. Petrillo, Washington, D.C., for plaintiff; Barbara A. Duncombe, Bowman, Conner, Touhey & Petrillo, Washington, D.C., of counsel.

Lorraine B. Halloway, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant; Lt. Col. O.D. Dearborn, Dept. of the Air Force, Washington, D.C., of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court on defendant's motion for partial summary judgment and plaintiff's opposition thereto. The court is presented with the difficult question of determining the viability of the *Fulford* doctrine after enactment of the Contract Disputes Act of 1978, Pub.L. No. 95–563, 92 Stat. 2383 (codified as amended at 41 U.S.C.A. §§ 601–613 (West Supp.1983)) (the "CDA").

## FACTS

Plaintiff D. Moody & Co., Inc., entered into a contract with the United States Air Force on June 19, 1980, for the delivery of 50 units of aircraft sleeves, which are tubular machine parts designed to connect two other parts. After inspection the Air Force on June 10, 1981, rejected the 50 sleeves initially shipped by plaintiff. Although plaintiff provided test results from its source that allegedly discounted the existence of defects, plaintiff tendered a second shipment of 38 sleeves that on October 20, 1981, also was rejected. Plaintiff contests the adequacy and conclusions of defendant's inspections and resultant rejections.

On November 23, 1981, the Air Force issued a cure notice allowing plaintiff ten days to furnish acceptable replacements absent which the contract would be terminated for default. Plaintiff submitted additional test results which allegedly proved the acceptability of the sleeves. By letter dated February 5, 1982, the Air Force informed plaintiff that the tests proffered by plaintiff revealed that the sleeves still failed to meet the contract specifications and that the Air Force therefore was processing the contract for default termination. A telegram dated March 1, 1982, terminated the contract for default. On the same day, the Air Force issued a contract modification confirming termination of the contract. The contract modification reached plaintiff on March 17, 1982.

The Air Force awarded a reprocurement contract for 13 sleeves. By final decision of October 27, 1982, the contracting officer assessed $17,631.25 in excess reprocurement costs against plaintiff. Plaintiff appealed this determination and the underlying default termination in its complaint filed in this court on May 10, 1983.

## DISCUSSION

Among the innovations the CDA wrought in 1978 was allowing contractors "direct access" to courts on disputes arising under the provisions of a contract, which theretofore could only be appealed to agency boards of contract appeals. 41

U.S.C. § 609(a). Section 10(a)(3) of the CDA, 92 Stat. 2388 (codified at 41 U.S.C. 609(a)(3) (Supp. V 1981)), provides in full:

Any action under paragraph (1) [brought in the United States Claims Court] ... shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim, and shall proceed de novo in accordance with the rules of the appropriate court.

Prior to the CDA, when a contractor could seek judicial review of adverse agency decisions on non-breach claims only after appeal to agency boards, the contractor was allowed six years from the date of a board decision within which to appeal to the United States Court of Claims. The period for the initial appeal to the board was not set by statute, but by the standard Disputes clause, which required a contractor to appeal to the appropriate board within 30 days from receipt of the contracting officer's written decision. *See generally* Sen.Rep. No. 95–1118, 95th Cong., 2d Sess. 5–6, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5235, 5239–40 [hereinafter cited as "Senate Report"]. Section 7 of the CDA, 92 Stat. 2385 (codified at 41 U.S.C. § 606), made the contract appeal period statutory and enlarged from 30 to 90 days the time for appealing a contracting officer's decision to an agency board. *See* Senate Report at 23, 1978 U.S.Code Cong. & Ad.News at 5257. Section 7 of the CDA provides in full:

Within ninety days from the date of receipt of a contracting officer's decision under section 605 of this title, the contractor may appeal such decision to an agency board of contract appeals, as provided in section 607 of this title.

Defendant grounds its motion for partial summary judgment on the time limitation of section 10(a)(3). Almost 14 months elapsed from plaintiff's receipt on March 17, 1982, of the contracting officer's decision terminating the contract for default and the commencement of plaintiff's suit on May 10, 1983. Although plaintiff filed its complaint within 12 months after the assessment of excess reprocurement costs, defendant urges that the complaint should be dismissed as time barred insofar as it challenges the contracting officer's default termination decision. Because 41 U.S.C. § 605(b) renders an unappealed contracting officer's decision "final and conclusive and not subject to review by any forum, tribunal or Government agency," defendant would not allow plaintiff to contest the default termination as a defense to the assessment of excess costs. Defendant also argues that the finality of the contracting officer's decision pursuant to section 605(b) establishes plaintiff's liability for excess reprocurement costs in an amount to be determined in further proceedings.

Plaintiff interposes the *"Fulford* doctrine," first articulated by the Armed Services Board of Contract Appeals (the "ASBCA") in *Fulford Manufacturing Co.,* ASBCA Nos. 2143, 2144 (May 20, 1955), 6 Cont.Cas.Fed. (CCH) ¶ 61,815 (May 20, 1955) (digest only). *Fulford* was decided when disputes between a contracting officer and a contractor were heard first by an agency board. The simple proposition embodied by the *Fulford* doctrine is that when a contractor timely appeals an assessment of excess reprocurement costs, the propriety of the Government's default determination can be challenged even though the default termination decision was not appealed.

Neither the Court of Claims nor the United States Claims Court has addressed the doctrine, although boards of contract appeals have employed it consistently since 1955. *See, e.g., Cosmic Construction Co.,* 84–1 B.C.A. (CCH) ¶ 17,028 (Dec. 9, 1983); *MPT Enterprises,* 83–2 B.C.A. (CCH) ¶ 16,-767 (Aug. 8, 1983); *John T. Penrod,* 80–2 B.C.A. (CCH) ¶ 14,789 (Nov. 14, 1980). Moreover, since the CDA has been in effect, government agency counsel have advised contractors that default issues could be raised upon assessment of excess costs. *See, e.g., J. Robert Dowie & Co.,* 82–2 B.C.A. (CCH) ¶ 15,876, at 78,748 (June 17,

1982); *Big Star Testing Co.*, 81–2 B.C.A. (CCH) ¶ 15,335, at 75,937 (Sept. 17, 1981).

1. Plaintiff offers two rationales to support the *Fulford* doctrine. First, according to plaintiff, the doctrine avoids unnecessary litigation. A contractor may not be interested in contesting a default determination as a matter of principle, but does have an interest or motive when that decision costs it money, *i.e.*, when excess reprocurement costs are assessed. *See, e.g., Polaroid Corp.*, 60–1 B.C.A. (CCH) ¶ 2,618, at 12,936 (Apr. 29, 1960). Not all default terminations are followed by reprocurements; moreover, the cost of any reprocurement is not final and cannot be assessed until the end of the reprocurement contract, which can take place later than one year after the default termination. Until such time a contractor may not know whether it has a pecuniary stake in contesting the default. *See, e.g., J. Robert Dowie & Co.*, 82–2 B.C.A. (CCH) ¶ 15,876 (June 17, 1982) (18-month period between default and assessment); *F. & J. Janitorial Services*, 81–2 B.C.A. (CCH) ¶ 15,425 (Sept. 30, 1981) (21-month period); *Big Star Testing Co.*, 81–2 B.C.A. (CCH) ¶ 15,335 (Sept. 17, 1981) (17-month period). Secondly, plaintiff argues the logic of the *Fulford* doctrine that the legality and propriety of the default is, of necessity, in issue when excess reprocurement costs are assessed. *See F.E. Constructors, J.V.*, 80–2 B.C.A. (CCH) ¶ 14,505, at 71,506 (May 23, 1980).

The second rationale bears closer scrutiny. Initially, the *Fulford* doctrine was limited to consideration of causes for excusable delay in a contractor's performance. *Fulford* interpreted both the Disputes and Default clauses. The Disputes clause in *Fulford* provided:

> *Except as otherwise provided in this contract,* any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writ-

ing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: *Provided,* That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive.

*Fulford,* slip op. at 12 (initial emphasis added; second in original).[1]

The Default clause at issue in *Fulford* read in pertinent part:

> (a) The Government may, *subject to the provisions of paragraph (b) below,* by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:
>
> (i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; ...

> \*　　\*　　\*　　\*　　\*　　\*

> (b) *The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor.* Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

> \*　　\*　　\*　　\*　　\*　　\*

---

1. The Disputes clause in plaintiff's contract is not part of the record, but after the CDA the Disputes clause was revised to refer to the CDA and to incorporate its statutory time limitations. *See* DAR 32 C.F.R. § 1–7.103.12 (1983).

(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (b) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled *"Termination for Convenience of the Government,"* and the rights and obligations of the parties hereto shall in such event be governed by such clause.

*Fulford, id.* at 13–14 (emphasis added).[2]

The ASBCA in *Fulford* reasoned that the finality provisions of the Disputes clause were subject to the Default clause, which made the contracting officer's right to terminate for default subject to subparagraph (b), which, in turn, relieved the contractor from liability for excess costs if the default resulted from excusable causes. More-

over, the ASBCA stated that subparagraph (e) allows excusability to be determined "at any time" after termination "in connection with an appeal from the assessment of excess costs since paragraph (e) provides that excusable causes will be determined pursuant to the provisions of paragraph (b)." *Fulford,* slip op. at 14–15. "A reasonable contractor reading paragraph (e) might well construe it to mean that regardless of what was said in the contracting officer's decision to terminate for default under paragraph (a), he could at a later time raise the issue of excusability." *Fulford, id.* at 14.

The ASBCA in *Fulford* noted that prior standard Default clauses expressly conditioned the Government's right to terminate upon a finding that the default was not excusable. There was no such express condition in the Default clause in *Fulford,* which is for all practical purposes the same as the Default clause in this case (quoted *supra* note 2). Applying the doctrine that

**2.** The Default clause, section 7–103.11 of plaintiff's contract, 32 DAR C.F.R. § 7–103.11 (1980), is substantially identical except for paragraph (e):

    (a) The Government may, *subject to the provisions of paragraph (c) below,* by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

    (i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; ...

     \*    \*    \*    \*    \*    \*

    (c) Except with respect to defaults of subcontractors, the *Contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor.* Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; *but in every case the failure to perform must be beyond the control and without the fault or negligence of the Contractor.* If the failure to perform is caused by the default of a subcontractor, and if such default arises out of causes beyond the control of both the Contractor and subcontractor, and without the fault or negligence of either of them, the Contractor shall not be liable for any excess costs for failure to per-

form, unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

     \*    \*    \*    \*    \*    \*

    (e) If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the default was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause. If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, and if this contract does not contain a clause providing for termination for convenience of the Government, the contract shall be equitably adjusted to compensate for such termination and the contract modified accordingly; failure to agree to any such adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Disputes."

    32 DAR C.F.R. § 1–8.707 (1983), is identical with respect to the quoted provisions.

ambiguities in a contract are resolved against the drafter, *Fulford* held that "[t]he time the contractor has to appeal from the notice of default on the issue of excusable delay is not 30 days from the receipt of such notice but 30 days from the receipt of notice of the assessment of excess costs." *Fulford, id.* at 15.

Defendant argues that the ASBCA in *Fulford* relied on interpretation of the Disputes clause time limits, which were contractual and thus waivable, whereas under the CDA the appeal time limits are statutory and nonwaivable. Plaintiff rejoins that, although the Court of Claims may have regarded these clauses as waivable, *see, e.g., Maney Aircraft Parts, Inc. v. United States,* 197 Ct.Cl. 159, 453 F.2d 1260 (1972), the ASBCA has never taken the position that it could waive such provisions. Plaintiff is correct. *See, e.g., Henry Products Co.,* 74–1 B.C.A. (CCH) ¶ 10,457, at 49,435 (Jan. 28, 1974); *J.R. Youngdale Construction Co.,* 73–1 B.C.A. (CCH) ¶ 9,944, at 46,659 (Feb. 28, 1973). Waiver of contract clauses was not at issue in *Fulford.* The decision rests on an interpretation of the Default clause in conjunction with the Disputes clause.

▮ The Disputes clause in *Fulford* has been superseded, *see supra* note 1, and the language signaling that other provisions of the contract could limit the finality of an unappealed decision is no longer included. Thus, the Disputes clause no longer complements the Default clause. The court concludes that the *Fulford* doctrine, drawn principally from the Default clause, is not invalid because the Disputes clause does not now state that the contract may contain other provisions that trigger the appeal period, if such provisions are still found elsewhere in the contract. The cross reference was redundant. Contract clauses are always to be construed together, as *Fulford* expressly noted. *Fulford,* slip op.

at 14. The Disputes clause has no significance except as other provisions of the contract delimit issues for resolution under the Disputes clause. The Default clause is one such provision.

Defendant incorrectly describes a *Fulford*-type appeal as one permitting an untimely appeal of a default termination, when, in fact, *Fulford* interprets the Default clause as one providing for contesting an improper termination either at default or at excess cost assessment. The *Fulford* doctrine is not jurisdictional, whereas the time limits imposed by sections 10(a)(3) and 7 of the CDA are. *Fulford* simply recognizes that the Default clause can allow the defense of excusability to be raised when the contracting officer assesses extra costs, provided that the challenge is timely made.[3]

Although defendant's cases on the strict application of the CDA are apposite, they do not address a *Fulford* situation or any situation involving interrelated decisions issued by a contracting officer, and none of the cases cited involves the effect, if any, of an issue's becoming ripe pursuant to standard contract clauses at either of two different times. In *Placeway Construction Corp. v. United States,* 713 F.2d 726 (Fed.Cir.1983), the Federal Circuit held that it lacked authority to waive the 120-day deadline for appeals from agency boards in a factual situation when an appeal was mailed, but not received, within the statutory period. *Cosmic Construction Co. v. United States,* 697 F.2d 1389 (Fed.Cir. 1982), involved the mailing of a contracting officer's decision to a contractor, not to its attorneys. The contractor sought from the agency board waiver of the 90-day appeal limitation of section 7 of the CDA because it had relied on the incorrect statement of the contracting officer's letter that a copy had been mailed to its attorneys. The court held that equity could not grant dis-

---

**3.** Defendant emphasizes that the contracting officer's March 1, 1982 decision terminating plaintiff's contract for default stated, *inter alia,* "This is the final decision of the termination contracting officer...." and set forth plaintiff's appeal rights under the CDA. To comport with the

Default clause in the subject contract, the contracting officer could have advised more precisely that the decision was final for purposes of the CDA unless reprocurement costs were assessed, in which case plaintiff's appeal rights dated from the later decision.

cretion to the board that it did not possess and affirmed dismissal. Since *Fulford* does not involve waiver, the *Cosmic Construction* court's disagreement with the decision to permit waiver in *Irvin D. Judkins,* 81–2 B.C.A. (CCH) ¶ 15,350 (Sept. 30, 1981), does not control.

*Gregory Lumber Co. v. United States,* 229 Ct.Cl. 762 (1982), also cited by defendant, involved assertions by the contractor that its efforts to obtain review by a board tolled the 12-month direct access limitation of section 10(a)(3). The court held that the administrative action was not mandatory and would not toll the statute. The court "cannot and should not read into ... [the CDA] exceptions and tolling provisions Congress did not contemplate or authorize." 229 Ct.Cl. at 763. Defendant does not assert that the *Fulford* doctrine presents a tolling rationale. In any event, under the *Fulford* doctrine the appeal time is not tolled, but causes an issue to arise at two separate times. Finally, the contractor in *LePeck Construction Corp. v. United States,* No. 325–80C (Cl.Ct. Oct. 27, 1983) (order denying motion to amend), unsuccessfully sought to revitalize an unappealed claim in a timely suit on unrelated claims.

That the CDA codified the time limitation for appealing administratively the contracting officer's decision as previously set forth in the Disputes clause and established a one-year deadline for filing an appeal in court does not preempt the *Fulford* doctrine. *Fulford* does not create time limitations, but only speaks to the events that start an appeal period.

■ 2. *Fulford* confined the issue which may be raised by the contractor upon assessment of excess costs to excusable delay. Plaintiff does not allege excusable delay, but rather the propriety of the Air Force's rejection of the aircraft sleeves. In *Allied Paint & Color Works, Inc.,* 44 Comp.Gen. 200 (1964), the Comptroller General decreed that the *Fulford* doctrine should be applied by all other agency contract boards. 44 Comp.Gen. at 204. *Allied Paint* involved the rejection of paint sam-

ples, just as plaintiff's appeal involves rejection of tendered parts. The Comptroller General realized that *Fulford* involved excusable delay, not rejection. 44 Comp.Gen. at 202. As agency counsel there argued: "The issue of compliance with specifications is an issue which does not embrace exculpatory circumstances or any other excuse for delay." *Id.* Nonetheless, *Allied Paint* concluded that "for more than 9 years the so-called 'Fulford Doctrine' has been applied to the circumstances [rejection] here under consideration [by the ASBCA]...." 44 Comp.Gen. at 204.

The board decisions relied upon for the Comptroller General's conclusion in *Allied Paint,* however, do not offer clear support. In *United Microwave Co.,* 1963 B.C.A. (CCH) ¶ 3,701 (Mar. 15, 1963), in which improper rejection was at issue, the board held that no final decision of the contracting officer assessing excess costs had been issued and, hence, the 30-day appeal time had not begun to run. *United Microwave* does show that the Government and the board embraced the broader application of *Fulford* by contending that appeal within 30 days of the excess cost assessment would include scrutiny of the default, but offers no rationale for the broadening of *Fulford.*

*Allied Paint* also cited *Capson Manufacturing Co.,* 60–2 B.C.A. (CCH) ¶ 2,803 (Sept. 30, 1960). *Capson* properly states the *Fulford* holding on excusability and then goes on to consider the issue of improper rejection as timely raised upon assessment of excess costs. No indication is given that defendant in *Capson* took issue with the ASBCA's consideration of rejection. In *Oxygen Equipment Service Co.,* 60–1 B.C.A. (CCH) ¶ 2,495 (Jan. 20, 1960), the contractor waited longer than the 30-day period provided in the Disputes clause to contest excess costs on the issue of excusability and contended that the contracting officer had not complied with regulations or made a final decision on the issue to commence the appeal period. The ASBCA ruled under *Fulford* that the notice of default termination and the notice of

excess cost assessment—neither of which expressly referred to excusability—inherently included an excusability determination and that the contractor had 30 days to appeal from the date of assessment of excess costs, which the contractor in *Oxygen Equipment* failed to do. Because the contractor contended that there was a lack of mutuality, *Oxygen Equipment* to some extent can be characterized properly as a case with an excusability issue other than delay, but again lacked a rationale for the extension of *Fulford.*

In 1978 the ASBCA expressly addressed the broadening of *Fulford.* In *Fairfield Scientific Corp.*, 78–1 B.C.A. (CCH) ¶ 13,-082, at 63,905 (Feb. 23, 1978), the board stated:

Notwithstanding the limited applicability [*i.e.*, to excusable delay] accorded the scope of the Fulford doctrine by most of our decisions, the doctrine has lent itself to a broader interpretation that would permit the consideration of *any* challenge to the original default termination, without regard to the issue of excusable delay.

(Emphasis added). *Fairfield* expanded the Fulford doctrine to the Government's failure to issue a cure notice pursuant to the Default clause. Again, however, no express rationale was derived from the language of the clauses; the conclusion was reached because of "the perception of the scope of the Fulford doctrine as entertained by the procurement community." *Id.* Nonetheless, the current standard Default clause, *see supra* note 2, allows an improper default to be changed to a termination for convenience for "any reason that the Contractor was not in default under the provisions of this clause," as well as on grounds of excusability. This may supply the missing rationale for the expansion of *Fulford.*

Despite its loose underpinnings, the long-standing practice to allow consideration of factors on appeal other than excusability should not be disturbed until defendant can offer good reason for doing so. *Cf. Baltimore & Annapolis R.R. v. Washington*

*Metropolitan Area Transit Commission,* 642 F.2d 1365, 1366 (D.C.Cir.1980); *International Union Automobile, Aerospace & Agricultural Implement Workers v. NLRB*, 459 F.2d 1329, 1341 (D.C.Cir.1972).

■ 3. The legislative history precursing the CDA gives no direction on the continued viability of the *Fulford* doctrine. Although sections 7 and 10(a)(3) of the CDA are free of any imprecision that would otherwise render examination of legislative history appropriate, defendant points to the statement in the Senate Report that the 12 months prescribed in section 10(a)(3) of the CDA is time enough for a contractor to decide whether to institute a court action. Senate Report at 10–11, U.S.Code Cong. & Ad.News at 5244–45. The Senate Report also noted a retreat from S.3178, 95th Cong., 2d Sess. § 10(a) (1978), which would have allowed direct access suits to be filed within 12 months of contract completion, instead of requiring the contractor to take each dispute to the contracting officer within 30 days after it arose and thereafter seeking direct access within one year. Senate Report at 10, 1978 U.S.Code Cong. & Ad.News at 5244. 41 U.S.C. § 609(d), (e), providing, respectively, for consolidation of claims and entry of judgment on fewer than all claims based on one contract, are consistent with the objective of requiring a contractor to appeal individual claims as they arise.

The CDA's extensive legislative history, including all draft bills, reveals that the section 10(a)(3) 12-month time limitation for contesting a contracting officer's decision in court was a matter that generated a singular lack of comment. Previous court appeals never involved *Fulford*-type questions because they did not seek review of decisions of a contracting officer in the first instance, but were appeals of board decisions. However, Congress was aware that an appeal time of less than a year from a contracting officer's decision to an agency board could lead to " 'protective' appeals on long-term contracts." The Administrator for Federal Procurement Policy of the Office of Management and Budget,

in recommending the 90-day appeal period to a board and a requirement of a 90-day notice before filing suit within one year, advised: "We agree this is a possibility but we believe the benefits of closing the books on contracting officer decisions within a relatively short period of time outweigh the danger of protective appeals." Joint Hearings on S. 2292, S. 2787, S. 3178 Before the Subcomm. on Federal Spending Practices and Open Government of the Senate Comm. on Governmental Affairs and the Subcomm. on Citizens and Shareholders Rights and Remedies of the Senate Comm. on the Judiciary, 95th Cong., 2d Sess. 95 (1978) (statement of Lester A. Fettig) [hereinafter cited as "Joint Hearings"]; Hearings on H.R. No. 664 and Related Bills Before the Subcomm. on Administrative Law and Governmental Relations of the House Comm. on the Judiciary, 95th Cong., 1st Sess. 73 (1977) (Statement of Lester A. Fettig) [hereinafter cited as "Hearings"]; see id. at 190, 199 (statement and testimony of O.S. Heistand, Esq.) (one-year period to file court action proposed to avoid protective lawsuits that would be filed if period were 90 days). The scant attention that was paid to protective appeals arose only in the context of the discussion over whether to require appeals to be filed within a period of less than one year. The reasonable implication is that a one-year period would avoid protective appeals, but appeals made unnecessary by the *Fulford* doctrine are those filed after excess cost decisions, which frequently issue more than one year after termination decisions. Congress cannot be inferred to have encouraged needless litigation by creating direct judicial access for aggrieved contractors, see Senate Report at 7, 1978 U.S.Code Cong. & Ad.News at 5241 (discouraging submission of unwarranted claims), but repudiation of

the *Fulford* doctrine would visit such suits on the boards and courts.

Under the Government's view, a contractor, not otherwise interested in contesting a default termination by seeking conversion to a termination for convenience, would come to court to appeal the default termination, move for a stay, and await a hypothetical assessment of excess reprocurement costs, which if not forthcoming could lead to dismissal of the suit. If a stay could not be obtained, the contractor would be forced to litigate the propriety of the default in anticipation of an assessment of costs and, failing that, dismissal might be sought. The interest of timely closing the books on contracting officer decisions is not served by forcing an appeal of a termination for default when the decision of real significance to the party who must come into court is the later decision assessing costs.[4]

Defendant argues that by enlarging the time to appeal to an agency board from 30 to 90 days and by allowing a court action to be filed within a year of the contracting officer's decision, the liberal time limits of sections 7 and 10(a)(3) of the CDA cured the problem of the 30-day appeal period that the *Fulford* doctrine was developed to remedy. In enacting the CDA, Congress recognized that some protective appeals would be filed even though appeal periods had been increased. However, the CDA's legislative history reveals that the agency board appeal period was extended from 30 to 90 days principally to aid the small contractor which misses its filing date due to mistake, Hearings at 77 (statement of Sen. Packwood), and to alleviate the hardship cases of tardy appeals. Joint Hearings at 253 (statement of Russell C. Lynch, Chairman, Legislative Comm., National Conference of Boards of Contract Appeals Mem-

---

4. Attaching finality to an unappealed default termination for other purposes, such as disqualifying a contractor from a subsequent contract award would be appropriate. Under the CDA a contractor is bound by a default determination unless and until it timely appeals the termination decision or asserts the impropriety of that determination as a defense to a contracting offi-

cer's decision assessing excess costs. Of course, a timely appeal of a default termination can result in a decision binding on a contractor in a subsequent appeal of a decision assessing excess costs. *See Hicks Corp. v. United States*, 203 Ct.Cl. 65, 72–73, 487 F.2d 520, 524 (1973) (per curiam).

bers); Hearings at 227 (statement of Russell C. Lynch); *see* H.R.Rep. No. 95–1556, 95th Cong., 2d Sess. 65, 69 (1978), U.S.Code Cong. & Admin.News 1978, p. 2383.

In enacting section 10(a) of the CDA, Congress did not state or imply a repudiation of the *Fulford* doctrine. No " 'deliberate choices of legislative policy' " or " 'discernible' " congressional intent on point is manifest. *United States v. W.H. Moseley Co.*, 730 F.2d 1472, 1475 (Fed.Cir. 1984) (quoting *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 215, 82 S.Ct. 1328, 1339, 8 L.Ed.2d 440 (1962)) (rejecting Government's contention that CDA permits direct appeals from board orders rendered under 41 U.S.C. § 605(c)(4)). The stated congressional purpose underlying sections 7 and 10(a)(3) of the CDA was to establish time limitations on administrative and judicial appeals, not to limit the events under a contract that give rise to appeals.

Section 10(a)(3) of the CDA, 41 U.S.C. § 609(a)(3), does not bar a contractor from contesting the propriety of a default termination in a suit appealing a final contracting officer's decision assessing excess reprocurement costs, if such a suit is filed within 12 months of that decision. Failure to seek judicial review of a default determination within 12 months after decision thereon, however, bars a contractor from judicially challenging the default determination unless excess costs are assessed.

The issue for decision on defendant's motion, in the court's opinion, involves a controlling question of law with respect to which there is a substantial ground for difference of opinion, and immediate appeal from the order entered herein may materially advance the termination of the litigation. Accordingly, the issue is certified pursuant to 28 U.S.C. § 1292(d)(2) (1982), should defendant seek an interlocutory appeal.

## CONCLUSION

Based on the foregoing,

IT IS ORDERED, as follows:

Defendant's motion for partial summary judgment is denied. Unless defendant has filed by April 20, 1984, a motion for stay of proceedings pursuant to 28 U.S.C. § 1292(d)(3), a status conference will be held at 10:00 a.m. on Friday, April 27, 1984, in the National Courts Building, 717 Madison Place, N.W., Washington, D.C., at which time the parties shall be prepared to address the matters listed in ¶ IV.B of the court's Order Governing Proceedings Before Trial entered this date.